Argued and submitted December 4, 1990, decision of the Court of Appeals and the order of the Employment Relations Board affirmed May 1, 1992

James ELVIN,
Joyce E. Bedient, Gary F. Burnett,
Jack Fulton, David M. Garrick, Roland Giesbrecht,
Harold W. Jacobs, Warren C. Johnson, Jr.,
Loren P. Link, Dennis D. Mattison,
Doug Sanford, Gregg L. Spooner, Thomas W. Tesch,
Kenneth N. Twidwell, Albert S. Wenzel,
James E. Yost and Paul Berg,
*Respondents on Review,*

*v.*

OREGON PUBLIC EMPLOYES UNION,
*Petitioner on Review.*

(ERB UP 38-87; CA A50465; SC S37333)

832 P2d 36

James S. Coon of Imperati, Barnett, Sherwood & Coon, P.C., Portland, argued the cause and filed the petition for petitioner on review.

Milton Chappell, Staff Attorney for National Right to Work Legal Defense Foundation, Inc., Springfield, Virginia, argued the cause for respondents on review.

Before Carson,** Chief Justice, and Peterson,*** Gillette, Van Hoomissen, Fadeley, and Unis, Justices.

GILLETTE, J.

Unis, J., dissented and filed an opinion.

---

** Carson, C. J., Chief Justice when case decided.

*** Peterson, J., Chief Justice when case argued.

## GILLETTE, J.

In this labor relations case, the Employment Relations Board (ERB) found that the Oregon Public Employes Union (OPEU) had committed an unfair labor practice under the Public Employees Collective Bargaining Act (PECBA), ORS 243.650 to 243.782, in the way in which OPEU collected "fair share" payments from nonunion public employees who were members of bargaining units represented by OPEU. ERB ordered OPEU to refund the fair share payments. On appeal, the Court of Appeals affirmed. *Elvin v. OPEU*, 102 Or App 159, 793 P2d 338 (1990). We allowed review and now affirm.

The issue in the present case is one of administrative law — whether ERB exceeded its authority under PECBA in ordering OPEU to refund to respondents their fair share payments. Because the predicate for ERB's order was its determination that OPEU had violated the standards set by *Chicago Teachers Union v. Hudson*, 475 US 292, 106 S Ct 1066, 89 L Ed 2d 232 (1986), we first discuss the labor law background that gave rise to the present case.

A union which exclusively represents public employees incurs costs.[1] Because such a union must represent all public employees fairly, many states have adopted statutes like PECBA that authorize assessment to all public employees of the costs of collective bargaining. Such an arrangement, the Supreme Court of the United States has said, "has been thought to distribute fairly the cost of [collective bargaining] activities among those who benefit, and it counteracts the incentive that employees might otherwise have to become 'free riders' — to refuse to contribute to the union while obtaining benefits of union representation that necessarily accrue to all employees." *Abood v. Detroit Board*

---

[1] "The tasks of negotiating and administering a collective-bargaining agreement and representing the interests of employees in settling disputes and processing grievances are continuing and difficult ones. They often entail expenditure of much time and money. The services of lawyers, expert negotiators, economists, and a research staff, as well as general administrative personnel, may be required." *Abood v. Detroit Board of Education*, 431 US 209, 221, 97 S Ct 1782, 52 L Ed 2d 261 (1977). (Citation omitted.)

*of Education*, 431 US 209, 222, 97 S Ct 1782, 52 L Ed 2d 261 (1977).

The foregoing would be unremarkable, were it not for the fact that forcing a person — even a member of a collective bargaining unit — to be affiliated with and, to some extent, to thereby further the social and political views of a union has an impact on the person's rights of free speech and association. *Abood v. Detroit Board of Education, supra*, 431 US at 222.[2] That impact is nonetheless constitutional, because the state's interest in collective bargaining is compelling. *Abood v. Detroit Board of Education, supra*, 431 US at 222. *See Ellis v. Railway Clerks*, 466 US 435, 455-56, 104 S Ct 1883, 80 L Ed 2d 428 (1984) ("It has long been settled that [a state's] interference with First Amendment rights [by requiring fair share payments] is justified by the governmental interest in industrial peace."). The fair share payments, however, cannot be used by the union to "contribute to political candidates and to express political views unrelated to [the union's] duties as exclusive bargaining representative." *Abood v. Detroit Board of Education, supra*, 431 US at 234.

> "The fact that the [nonunion employees] are compelled to make, rather than prohibited from making, contributions for political purposes works no less an infringement of their constitutional rights. For at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State."

*Id.* at 234-35. (Footnote omitted.)

To prevent compulsory subsidization of a union's ideological activity by nonunion public employees, without

---

[2] The reasoning behind this holding is that a public employee has a fundamental right under the First Amendment to associate, or to choose not to associate, with a group that supports a political ideology. *See Wooley v. Maynard*, 430 US 705, 714, 97 S Ct 1428, 51 L Ed 2d 752 (1977) (holding that the First Amendment "secures the right to proselytize religious, political, and ideological causes"); *Abood v. Detroit Board of Education, supra*, 431 US at 230 (stating that the difference between private and public employees does not, by itself, justify greater First Amendment infringement of the rights of public employees). And, "[t]here can be no quarrel with the truism that because public employee unions attempt to influence governmental policymaking, their activities — and the views of members who disagree with them — may be properly termed political." *Abood v. Detroit Board of Education, supra*, 431 US at 231.

restricting that union's ability to require every employee to contribute to the cost of collective bargaining, the Supreme Court in *Chicago Teachers Union v. Hudson, supra,* announced three procedural safeguards to insure the protection of a nonunion employee's First Amendment rights. In that case, the Chicago Teachers Union had imposed, with the approval of the Chicago Board of Education, a fair share payment of 95 percent of the union membership dues. 475 US at 295. The fees were deducted from the nonunion employees' paychecks. After the paycheck deductions, nonunion employees could pursue objections by writing the union president within 30 days of the first payroll deduction, which would lead to a series of internal union hearings, potentially resulting in an arbitration paid for by the union. If the nonunion employee's objection proved correct, the union would immediately reduce future fair share payments and offer a rebate to the objector.

The Supreme Court held that the Chicago Teachers Union's procedures for the collection and use of the fair share payments violated the First Amendment. The Court further held that the union's subsequent adoption of an escrow arrangement for disputed payments did not cure any constitutional defect. Three procedural safeguards are required, the Court held, in order for a fair share deduction system to pass constitutional muster.

The first procedural safeguard is a prohibition against permitting a union to exact a fair share payment without first offering a procedure by which the employee may object. The second is that the procedure must provide nonunion employees with adequate information about the basis for the amount of the fair share payment. The third procedural safeguard is that the state must provide for a reasonably prompt decision, by an impartial decisionmaker, when a nonunion employee objects to the amount of the fair share payment. *Chicago Teachers Union v. Hudson, supra,* 475 US at 305-07.

The Supreme Court emphasized that "[t]he purpose of these safeguards is to insure that the government treads with sensitivity in areas freighted with First Amendment concerns." *Id.* at 303 n 12.

> "Procedural safeguards are necessary to achieve this objective for two reasons. First, although the government interest in labor peace is strong enough to support an 'agency shop' notwithstanding its limited infringement on nonunion employees' constitutional rights, the fact that those rights are protected by the First Amendment requires that the procedure be carefully tailored to minimize the infringement. Second, the nonunion employee — the individual whose First Amendment rights are being affected — must have a fair opportunity to identify the impact of the governmental action on his interests and to assert a meritorious First Amendment claim."

*Id.* at 302-03. (Footnotes omitted.)

With the foregoing in mind, we turn to a discussion of the specific facts and, particularly, of the remedy that ERB ordered in the present case. Based on the facts, ERB's rationale for its order, and in the language used in that order, we hold that ERB permissibly imposed an order of restitution.

Respondents are 21 public employees who are represented by but not members of OPEU. Under PECBA, the state is permitted to recognize OPEU as a bargaining representative on behalf of public employees in a bargaining unit. OPEU is required to bargain on behalf of all employees in the bargaining unit, regardless of individual membership in OPEU.[3]

OPEU and the state entered into a collective bargaining agreement for 1985-87 which provided, in part, that "bargaining unit members who are not members of the Union shall either become members of the Union or make payment in lieu of dues to the Union." These "payments-in-lieu-of-dues," also called "fair share payments," are defined by ORS 243.650(16) as "an assessment to defray the cost for services by the exclusive representative in negotiations and contract administration of all persons in an appropriate bargaining unit who are not members of the organization serving as exclusive representative of the employees."

---

[3] ORS 243.666 provides, in part:

"(1) A labor organization certified by the Employment Relations Board or recognized by the public employer is the exclusive representative of the employees of a public employer for the purposes of collective bargaining with respect to employment relations."

In December 1986, OPEU adopted a set of procedures to determine the amount of and to collect fair share payments from nonunion employees. The procedures were crafted to comply with the First Amendment safeguards established in *Chicago Teachers Union v. Hudson, supra.* In mid-January 1987, OPEU sent a notice to all nonunion employees announcing the amount of the fair share payment, discussing what expenses were chargeable to collective bargaining and how nonunion employees could challenge the amount of the fee.

Respondents timely notified OPEU of their objection to the collection and use of a fair share payment by OPEU for any purpose other than respondents' pro rata share of the local bargaining unit's cost of collective bargaining, contract administration, and grievance adjustment. Further, respondents objected to the procedures used by OPEU to determine and collect the amount of the fair share payments.

Upon receiving respondents' objections, OPEU sent a revised rebate check and a notice to each respondent for 1985-86. On OPEU's request, the American Arbitration Association (AAA) arranged for an arbitrator to conduct a hearing on respondents' objections. Respondents retained counsel and objected to AAA's administration of the hearing and OPEU's collection of fair share payments without providing respondents with an audited statement of financial information. Respondents received notice of the hearing set by AAA, but did not participate. Following the hearing, the arbitrator found that OPEU had "computed and rebated the fair share fee with sufficient accuracy of amount, except for [$1,331.71]," and ordered OPEU to adjust the 1985-86 fair share rebate to the respondents accordingly.

On April 24, 1987, respondents filed the present case with ERB, alleging that OPEU had violated PECBA by collecting fair share payments without having first complied with the First Amendment safeguards established in *Chicago Teachers Union v. Hudson, supra.* ERB investigated the complaint and, after allowing all parties to submit briefs, issued an order on November 1, 1988. ERB concluded that OPEU had violated ORS 243.672(2)(a) and (c) by failing to meet the *Chicago Teachers Union v. Hudson* safeguards.[4]

---

[4] ORS 243.672(2)(a) and (c) provide:

ERB found that OPEU had committed that unfair labor practice when it failed to provide respondents with a verification of expenses from an independent audit and an explanation of the chargeable purpose for payments made to affiliates, and failed to justify its escrow of a portion of respondents' fair share payments on the basis of an independent audit of the disputed category of expenses.

In explaining its decision, ERB stated:

"A union's fair-share assessment procedures, to be valid under the PECBA, must conform with the requirements of the U.S. Constitution expressed in *Chicago Teachers Union v. Hudson* * * *.

"* * * * *

"A statute that allows a union and a public employer to agree to compel support of the exclusive representative is constitutional, *Abood* [*v. Detroit Board of Education,*] *supra.* To preserve that constitutionality, however, the procedures used to collect fair share funds must conform with the requirements expressed in [*Chicago Teachers Union v.*] *Hudson.* It is incumbent on this Board, therefore, to conclude that assessments made pursuant to a fair share agreement are lawful under the PECBA only if they are collected in a manner that provides the [*Chicago Teachers Union v.*] *Hudson* procedural protections.

"* * * * *

"The *system* instituted by OPEU for fair share collections included provisions that concerned all three [*Chicago Teachers Union v.*] *Hudson* safeguards * * *. The implementation of the system, however, failed to meet, in some respects, the [*Chicago Teachers Union v.*] *Hudson* requirements."

(Emphasis in original.)

Once finding that OPEU had violated PECBA, ERB then ordered OPEU to refund to respondents the fair share

---

"It is an unfair labor practice for a public employee or for a labor organization or its designated representative to do any of the following:

"(a) Interfere with, restrain or coerce any employee in or because of the exercise of any right guaranteed under [PECBA].

"* * * * *

"(c) Refuse or fail to comply with any provision of [PECBA]."

payments that OPEU had obtained through that unfair labor practice.[5] ERB stated:

"In addition to issuing a cease and desist order, this Board should order affirmative action as a remedy for OPEU's violations.

"The issue of a remedy in this case is difficult to resolve. We are required, where we find unfair practices to have been committed, to order such 'affirmative action' as will 'effectuate the purposes' of the PECBA. ORS 243.676(2)(c); * * *

"[Respondents] were 'harmed' by OPEU's violations in that the OPEU procedure for collecting fair share [payments] did not afford them all the procedural protections prescribed by [*Chicago Teachers Union v.*] *Hudson*. * * *

"[Respondents] contend that 'if money is actually collected under an illegal scheme, it should be returned to the fee payors'; and, therefore, that '[c]omplete restitution is the only remedy that can serve the purposes of [PECBA], make the parties whole, and protect the constitutional rights of fee payors.'

"* * * * *

"OPEU's escrow violation (limited escrow not based on an independent verification) gave the union full use of certain funds (difference between the limited escrow amount and a 100 percent escrow of objectors' fees) for a brief period of time (from time of objection until the arbitrator's decision). The financial effect of this violation on [respondents] was nil, however[,] because the fair share amount deducted from their paychecks would have been the same (under a 100 percent escrow) as the amount actually deducted.

"OPEU's notice violation (failure to use verified figures or provide an explanation of chargeable payments to affiliates) likewise did not have a financial impact on

---

[5] The authority for ERB's order in the present case is ORS 243.676(2):

"Where * * * [ERB] finds that any person named in the complaint has engaged in or is engaging in any unfair labor practice charged in the complaint, [ERB] shall:

"(a) State its findings of facts;

"(b) Issue and caused to be served on such person an order that the person cease and desist from the unfair labor practice;

"(c) Take such affirmative action, including but not limited to the reinstatement of employees with or without back pay, as necessary to effectuate the purposes of * * * [PECBA]; * * *"

[respondents] because they, in fact, did object to any payments for nonchargeable activities in response to the defective notice.

"A typical monetary 'make-whole' remedy in this case, consequently, would provide no remedy at all to [respondents]. A cease and desist order alone, however, would not effectuate the purposes of PECBA in that OPEU would suffer no loss due to its unlawful conduct because it already has collected all fees possible under the fair share agreement at issue, which expired June 30, 1987.

"* * * * *

"[Respondents] charged, and proved, that the OPEU procedure for the collection of fair share funds did not conform with the [*Chicago Teachers Union v.*] *Hudson* procedural requirements. Because any fair share assessment against [respondents] should have conformed with [*Chicago Teachers Union v.*] *Hudson*, and because of the constitutional nature of the rights violated at that point, we order OPEU to refund * * * all payments in-lieu-of-dues made to it by [respondents] after October 26, 1986, pursuant to the fair share agreement in the 1985-87 collective bargaining contract between OPEU and the State of Oregon."

(Footnotes omitted.)

OPEU petitioned for judicial review of the ERB order to the Court of Appeals. OPEU did not dispute ERB's conclusion that it had violated ORS 243.672(2)(a) and (c), but instead limited its argument to a claim that ERB had invalidly ordered restitution. In affirming ERB's order, a majority of the Court of Appeals, sitting *en banc*, stated:

"When the legislature authorized ERB to '[t]ake such affirmative action * * * as necessary to effectuate the purposes of' PECBA, it must have contemplated that ERB have the authority to deter violations of PECBA and to promote protection of the constitutional rights of those who choose not to participate in a union. ERB's order in this case is consistent with such a broad grant of authority. As respondents point out, ERB simply returned to them that which OPEU could not constitutionally collect. ERB acted within the authority granted to it by the legislature when it sought to deter OPEU or any other union from violating the provisions of PECBA or from not complying with the procedural safeguards of [*Chicago Teachers Union v.*] *Hudson*."

*Elvin v. OPEU, supra*, 102 Or App at 164. (Footnote omitted.)

Two judges dissented, arguing that "ERB's punitive purpose, and the lack of any financial harm to [respondents] * * *, makes the order a penalty [and therefore unlawful]." *Id.* at 166 (Graber, J., dissenting). Because ERB's "only authority to take punitive action is under the provisions of ORS 243.676(4), which ERB specifically did not invoke in this case," the dissent argued, "ERB's order that OPEU refund the fair share fees exceeded its authority under ORS 243.676(2)(c)." *Id.* The dissent expressly rejected respondents' argument that OPEU's unconstitutional collection of fees under PECBA was a financial harm, because ERB had found no financial impact on respondents. *Id.* at 165-66.

Before this court, OPEU contends that ERB's order was a civil penalty which ERB only can impose under ORS 243.676(4), not 243.676(2)(c).[6] OPEU asserts that our disposition of the present case should be guided by *Carpenters Local v. Labor Board*, 365 US 651, 81 S Ct 875, 6 L Ed 2d 1 (1961), in which, OPEU asserts, the United States Supreme Court interpreted the National Labor Relations Act (NLRA), 29 USC §§ 151-169, the federal statute after which PECBA is modeled,[7] to prohibit remedies intended to punish a union. In the alternative, OPEU contends that, although it did violate the procedural requirements set out in *Chicago Teachers*

----

[6] ORS 243.676(4) provides:

"The [Employment Relations Board] may award a civil penalty to any person as a result of an unfair labor practice complaint hearing, in the aggregate amount of up to $1,000 per case, without regard to attorney fees, if:

"(a) The complaint has been affirmed pursuant to subsection (2) of this section and the board finds that the person who has committed, or who is engaging, in an unfair labor practice has done so repetitively, knowing that the action taken was an unfair labor practice and took the action disregarding this knowledge, or that the action constituting the unfair labor practice was egregious; or

"(b) The complaint has been dismissed pursuant to subsection (3) of this section, and that the complaint was frivolously filed, or filed with the intent to harass the other person, or both."

[7] Although when enacted in 1973, PECBA was not identical to the NLRA, 29 USC §§ 151-168 (1971), PECBA was very similar in structure and language, as well as purpose. *Compare* Or Laws 1973, ch 536 *with* 29 USC §§ 151-168 (1971). For analyses of the similarities between PECBA and the NLRA, see Brodie, *Public Sector Collective Bargaining in Oregon*, 54 Or L Rev 337 (1975); and Comment, *Deferral to Arbitration in Individual Rights Cases: A Comparison of the NLRB and Oregon's ERB*, 18 Willamette L J 475, nn 120, 172, 173 (1982).

*Union v. Hudson, supra,* that violation was minor, not requiring any return of respondents' fair share payments.

In its order, ERB held that OPEU had violated the rule of *Chicago Teachers Union v. Hudson, supra,* in two respects: (1) OPEU did not provide respondents with a verification of expenses from an independent audit or with an explanation of the chargeable purpose for payments made by the union to certain affiliates; and (2) OPEU did not justify its escrow of a portion of respondents' fair share payments on the basis of an independent audit of the disputed category of expenses represented by the escrow. ERB found that respondents "were 'harmed' by OPEU's violations in that the OPEU procedure for collecting fair share [payments] did not afford them all the procedural protections prescribed by [*Chicago Teachers Union v.*] Hudson."[8]

Because it found that OPEU had failed to implement PECBA in a constitutionally permissible manner, ERB reasoned that OPEU lacked statutory authority under PECBA to retain the fair share payments at all. Accordingly, ERB ordered a refund of the fair share payments pursuant to ERB's authority under ORS 243.676(2)(c) to "[t]ake such affirmative action * * * as necessary to effectuate the purposes of" PECBA.[9]

■ OPEU argues that certain language in ERB's order indicates that the restitution order was not affirmative action taken to effectuate the purposes of PECBA but was, instead, a

---

[8] ERB stated that the escrow violation committed by OPEU "is not made moot, or cured, by the fact that the escrow amount established by [OPEU] was 'right'; that is, that the further rebate ordered by the arbitrator did not exceed the amount in escrow. The Court in [*Chicago Teachers Union v.*] *Hudson* explains that even a 100 percent escrow is not sufficient where the procedure by which the funds are collected is constitutionally flawed." ERB also stated that "[t]he Court [in *Chicago Teachers Union v. Hudson*] apparently concluded that verified financial figures are *necessary* to give a nonmember 'a fair opportunity to identify the impact' of the fair share assessment on his First Amendment rights." (Emphasis supplied.)

[9] ERB order stated:

"[Respondents] charged, and proved, that the OPEU procedure for the collection of fair share funds did not conform with the [*Chicago Teachers Union v.*] Hudson procedural requirements. *Because any fair share assessment against [respondents] should have conformed with Hudson, and because of the constitutional nature of the rights violated at that point, we will order OPEU to refund* * * * all payments in-lieu-of-dues made to it by [respondents] * * *."

(Emphasis supplied.)

civil penalty aimed at punishing OPEU. The allegedly "punitive" language is:

> "A typical monetary 'make-whole' remedy in this case, consequently, would provide no remedy at all to [respondents]. A cease and desist order alone, however, would not effectuate the purposes of PECBA in that OPEU would suffer no loss due to its unlawful conduct because it already has collected all fees possible under the fair share agreement at issue * * *."

We do not find that language or rationale to be punitive.

In the first sentence of the challenged language, ERB recognizes that, as to OPEU's violation of PECBA, respondents suffered no financial harm. ERB then states that the remedy of a cease and desist order would not, by itself, give respondents complete relief. The reason is that OPEU would still hold a certain amount of fair share payments that OPEU had obtained through an unconstitutional implementation of PECBA. The words "OPEU would suffer no loss" refer, therefore, to requiring OPEU to disgorge what it obtained unlawfully — respondents' fair share payments. That is restitution, not a penalty — it makes those who were victimized whole, while taking nothing from OPEU that lawfully was collected by it. To read ERB's order otherwise is to infer that, by coincidence, the punitive "loss" that ERB ordered OPEU to suffer is the exact amount that OPEU unconstitutionally had collected from respondents. When given the choice to interpret an agency order to be based in either logic or coincidence, we will assume logic.

■ We reject OPEU's contention that the ERB order was a civil penalty. The order was one of restitution. We next turn to the question of whether ERB had the authority under ORS 243.676(2)(c) to order OPEU to refund to respondents their fair share payments and, if so, whether that authority was properly exercised by ERB in this case.

Because, as noted above, PECBA was adopted to model the NLRA, we look to cases decided under the NLRA, and particularly to cases decided prior to 1973 — the year in which PECBA was adopted — to obtain guidance in interpreting PECBA. *See U. of O. Co-Oper. v. Dept. of Rev.*, 273 Or 539, 544, 542 P2d 900 (1975) ("When an Oregon statute has been

copied from federal law this court will adopt the interpretation given the federal act by the federal courts"; the interpretation given a parallel federal act by federal courts *after* the adoption of the Oregon statute is merely persuasive); *Klamath Co. v. Laborers Inter. Union*, 21 Or App 281, 288, 534 P2d 1169 (1975) ("the similarity between parts of the [NLRA and PECBA] indicates that federal decisions interpreting the NLRA be given some weight in interpreting similar sections of the Oregon statute"); *see also Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 21, 803 P2d 1178 (1991) (in interpreting Oregon securities laws drawn from the federal Securities Exchange Act of 1934, "it is appropriate to look for guidance to federal court decisions interpreting similar federal laws, even though those decisions do not bind us.").

One particularly helpful pre-1973 case construing the NLRA turns out to be one of our own. In *Corvallis S. & G. Co. v. H. & P. Eng.*, 247 Or 158, 166, 419 P2d 38 (1966) *cert den* 387 US 904 (1967), three different employers brought a suit in equity against a union with which the three employers had collective bargaining agreements. The employers sought to rescind their agreements with the union, and sought restitution from the union for certain amounts paid pursuant to the agreements. The employers previously had been successful on a complaint before the National Labor Relations Board (NLRB), where the NLRB had found that the union had committed an unfair labor practice. Before this court, the union argued that the employers could not obtain state court relief, because of the employers' previous action before the NLRB. The employers argued that their state court suit was a contractual consequence of the NLRB's decision.

This court held that the employers could not maintain their equity suit because, among other things, the NLRB's "failure to order restitution indicates its belief that in this instance federal labor policy did not require it." *Id.* at 166. In reaching its holding, this court interpreted the NLRA's grant of authority to the NLRB, specifically 29 USC § 160(c) (1947), the provision from which ORS 243.676(2)(c) is derived.[10] This court stated that "[t]he restitution of money

----

[10] The analogous portion of the NLRA, 29 USC § 160(c), provides:

paid as a result of a contract entered into because of unfair labor practices would certainly come within '* * * such affirmative action * * * as will effectuate the policies of this subsection * * *.' " *Id.*

Because we interpret PECBA by looking to how the NLRA was interpreted before 1973, we conclude that, as we stated concerning the NLRB in *Corvallis S. & G. Co. v. H. & P. Eng.*, *supra*, that ERB's authority to order "such affirmative action * * * as necessary to effectuate the purposes of" PECBA, ORS 243.676(2)(c), includes the authority to order restitution as a remedy for an unfair labor practice.[11]

In addition to our statement in *Corvallis S. & G. Co.*, nothing in the legislative history of PECBA indicates that an order of restitution is not permitted under ORS 243.676(2)(c). There is evidence that subsection (4) of ORS 243.676, adopted in 1983, Or Laws 1983, ch 559, § 1, was intended to allow ERB the authority to impose civil penalties. That amendment to PECBA, however, merely *added to* ERB's authority. It did not purport to *deprive* ERB of its pre-existing authority to order restitution under ORS 243.676(2)(c).[12]

We hold that, under ORS 243.676(2)(c), ERB has the authority to order restitution as a remedy for an unfair labor practice under PECBA. We turn next to the question of whether ERB exercised that authority properly in this case.

---

"[Where the Board finds an unfair labor practice], then the Board shall state its findings of fact and shall issue and cause to be served on such person an order requiring such person to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, as will effectuate the policies of this subchapter."

[11] Post-*Chicago Teachers Union v. Hudson* decisions have split over whether restitution of the full amount of fair share payments is required. *See, e.g., Lowary v. Lexington Local Bd. of Educ.*, 854 F2d 131, 134-35 (6th Cir 1988) (full restitution order permissible); *Gibney v. Toledo Bd. of Educ.*, 40 Ohio St 3d 152, 158, 532 NE2d 1300 (1988) (same); *Giplin v. AFSCME, AFL-CIO*, 875 F2d 1310 (7th Cir) *cert den* 493 US 917 (1989) (*contra*).

[12] We reject OPEU's argument that this case should be controlled by *Carpenters Local v. Labor Board*, 365 US 651, 655-56, 81 S Ct 875, 6 L Ed 2d 1 (1961). In *Carpenters Local v. Labor Board, supra*, the Supreme Court held that the NLRB did not have the power under 29 USC § 160(c) to issue punitive orders. The Court did not hold that orders of restitution are impermissible under the NLRA. As discussed above, the ERB's order in this case was restitutionary, not punitive.

■ As already explained, ERB found (and OPEU concedes) that OPEU committed an unfair labor practice under PECBA when OPEU failed to afford to its fair share contributors the procedural requirements established in *Chicago Teachers Union v. Hudson, supra.* ERB believed that restitution of the fair share payments as the remedy for OPEU's violation of respondents' constitutional rights was the only practical way to vindicate those rights. That remedy was within ERB's statutory discretion.

Finally, OPEU argues that its violation of the rule of *Chicago Teachers Union v. Hudson, supra,* was minor and, because it was minor, the holding of *Chicago Teachers Union v. Hudson, supra,* did not require ERB to order OPEU to refund to respondents their fair share payments. Therefore, OPEU argues, ERB erred in ordering OPEU to make that refund. We disagree. It is clear from ERB's order that the agency took the union's level of fault into consideration in attempting to find an appropriate disposition. The order demonstrates that the selection of restitution as a remedy was a classic example of the informed exercise of discretion. There was no abuse of that discretion, and there was no error.

The decision of the Court of Appeals and the order of the Employment Relations Board are affirmed.

**UNIS, J.,** dissenting.

I disagree with the analysis and conclusion reached by the majority. Because I agree with the reasoning and conclusion of Graber, Judge Pro Tempore, in *Elvin v. OPEU,* 102 Or App 159, 164-68, 793 P2d 338 (1990) (Graber, J., dissenting), I respectfully dissent.