Argued and submitted December 28, 2006, affirmed July 5, petition for review denied October 18, 2007 (343 Or 363)

ASSOCIATION OF OREGON
CORRECTIONS EMPLOYEES,
*Petitioner,*

*v.*

STATE OF OREGON,
DEPARTMENT OF CORRECTIONS,
*Respondent.*

OREGON STATE POLICE OFFICERS' ASSOCIATION,
*Petitioner,*

*v.*

STATE OF OREGON,
DEPARTMENT OF STATE POLICE,
*Respondent.*

Employment Relations Board
UP2504; A130669

164 P3d 291

Becky Gallagher argued the cause for petitioners. With her on the briefs was Garrettson, Goldberg, Fenrich & Makler, P.C.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondents. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge,* and Brewer, Chief Judge,** and Wollheim, Judge.

WOLLHEIM, J.

---

* Edmonds, P. J., *vice* Linder, P. J.

** Brewer, C. J., *vice* Richardson, S. J.

## WOLLHEIM, J.

Following the dot-com boom years of the late 1990s and the early 2000s, this state faced a serious recession. As a result of that recession, revenue to the state fell far short of previous revenue forecasts. This case arose from state employee salary freezes during the 2003-05 biennium and involves a dispute between two labor organizations and two state agencies under the Public Employees Collective Bargaining Act (PECBA), ORS 243.650 to 243.782. The Association of Oregon Corrections Employees (AOCE) filed an unfair labor practice complaint against the Oregon Department of Corrections (DOC), and the Oregon State Police Officers' Association (OSPOA) filed an unfair labor practice complaint against the Oregon State Police (OSP). Both complaints alleged that the state agencies committed unfair labor practices during the course of negotiating new contracts. As both complaints involved the same issues, the Employment Relations Board (the board) consolidated the complaints for hearing and disposition. The board, with one member separately concurring, ultimately dismissed the complaints, and both unions (collectively, petitioners) seek judicial review. For the reasons explained below, we affirm.

We take the facts—which petitioners do not challenge on judicial review—from the board's order. When the new Governor took office in January 2003, the state was in the midst of a recession; forecasted revenues for the 2003-05 biennium showed a budgetary shortfall of more than $1 billion. As a result, the Governor proposed a budget to the legislature that included a salary freeze for all state employees during the entire 2003-05 biennium. That is, no money was included in the budget for either cost-of-living adjustments (COLAs) or increases based on advancement on salary schedule steps (step increases), which are annual salary increases for merit and longevity that are received by many state employees. The legislature approved a 2003-05 budget that provided that no state employee would receive a COLA or a step increase.

Typically, the state begins negotiation with public employee unions soon after the legislature convenes. Also typically, a collective bargaining agreement (CBA) between

the state and a public employee union lasts for one biennium. In early 2003, collective bargaining began. The state's chief negotiator for collective bargaining understood that, in light of the budgetary constraints, she had virtually no flexibility in bargaining over salaries; money was available for only minor salary range increases based on changes in individual classifications or pay differentials. In February 2003, the state began negotiations with the Service Employees International Union Local 503, Oregon Public Employees Association (SEIU), which represents about 65 percent of the state's employees. The state initially proposed a wage freeze. After months of bargaining, the state and SEIU reached tentative agreement on a 2003-05 CBA. Under the agreement, wages for bargaining unit members would be frozen for the 2003-05 biennium. There would be no COLAs or step increases. However, each employee who worked for the state from July 1, 2003 through January 2005 would receive a one-time "workload adjustment" payment of $350.

Gary Weeks, then administrator of the Department of Administrative Services, was present at meetings in January and February 2003 during which the state's chief negotiator and representatives from the Governor's office discussed the state's bargaining strategy. He also was present at the bargaining session in which the state and SEIU reached their tentative agreement providing for a wage freeze and work adjustment payment of $350. At that time, Weeks spoke with Leslie Frane, the head of the SEIU bargaining unit. Frane noted that SEIU was the first union to reach agreement with the state, and she expressed concern that other unions might receive more favorable contract terms. Weeks said that the Governor's position would remain consistent, *viz.*, that no money was available for salary increases. Weeks told Frane that the state would take the same position with all other unions as it had taken with SEIU and that other unions also would receive wage freezes because there was no money for COLAs or step increases.

Except for the unions involved in this case, all CBAs between the state and public employee unions for the 2003-05 biennium included a 24-month wage freeze. Because the effective dates of the contracts vary, some of the negotiated wage freezes extended beyond June 30, 2005, the end of the

2003-05 biennium. Some of the contracts provided employees with a one-time $350 workload adjustment payment; other contracts gave employees a choice between workload adjustment payments or paid leave.

AOCE is the exclusive representative of a mixed bargaining unit of DOC employees. In January 2003, AOCE and DOC began negotiations for a new CBA that was to replace the CBA that would expire on June 30, 2003.[1] The parties participated in seven collective bargaining sessions between January and June 2003. At a June bargaining session, DOC proposed a two-year wage freeze; it also proposed increases in the dollar amount of the employer-paid health insurance subsidy, but did not offer to guarantee that DOC employees would incur no out-of-pocket health insurance costs. In response, AOCE proposed to continue COLAs and step increases.

Before continuing to describe the bargaining history, it would be helpful to describe some of the unique features under PECBA for public employees who are prohibited from striking. Corrections officers at a correctional institution and police officers are both prohibited from striking. ORS 243.736(1). Due to that prohibition, PECBA provides procedures when the state and the public employees cannot reach voluntary agreement. The next step after failed negotiations is mediation. ORS 243.712. Fifteen days after mediation begins, a party may declare an impasse. ORS 243.712(2)(a). If a party does so, each party must submit a final offer to the mediator. ORS 243.712(2)(b). The final offer must contain the party's proposed contract language and a cost summary. ORS 243.650(11). Binding arbitration is the last step in the process for public employees who are prohibited from striking. ORS 243.742. The procedures for arbitration in this context are not the normal arbitration procedures. Pursuant to ORS 243.746(3), each party must submit a last best offer package on all unresolved mandatory subjects of bargaining. Not more than 30 days after the conclusion of the arbitration hearing, the arbitrator selects one of the last best offer packages and the terms of the last best offer package selected are

---

[1] A mixed bargaining unit consists of some members who could strike, ORS 243.726(1), and some members prohibited from striking, ORS 243.736.

final and binding on the parties. ORS 243.746(5); ORS 243.752(1).

As indicated, AOCE and DOC did not reach voluntary agreement, and the matter proceeded to mediation and then arbitration. For mediation, DOC's final offer included no COLAs and no step increases for 24 months—from July 1, 2003 through June 30, 2005—in other words, DOC proposed a salary freeze. DOC's final offer provided that the parties could agree in writing to begin the suspension of step increases at a later date, but that the freeze would be in effect for 24 months. In regard to health insurance, DOC's proposal was the same as its earlier one. AOCE's final offer included a proposal to provide a COLA on July 1, 2005. AOCE also provided a counter-proposal regarding step increases and proposed that DOC pay the full cost of the medical, dental, and disability plans selected by employees. Mediation was not successful.

Before the matter proceeded to arbitration, the parties agreed to the following term for the CBA: "This Agreement, and attachments hereto, unless otherwise provided for herein, shall be in full force and effect from the signing of this Agreement through June 30, 2005."

In January 2004, the parties submitted their last best offers before arbitration. AOCE included no proposal for any COLA during the biennium, but it repeated its earlier proposal for continuing step increases. AOCE also proposed that DOC pay the cost of insurance plans selected by employees for the 2004 and 2005 plan years. If adopted, AOCE's health insurance proposal would have remained in effect after June 30, 2005, the date on which the contract would expire. DOC's last best offer included a proposal that suspended all step increases for a period of "up to 24 months" from the date on which the arbitrator's award was issued. The proposal also stated that "nothing in this provision precludes the parties from reopening this subject for successor bargaining (2005-2007)." (Emphasis omitted.)

Ultimately, the arbitrator selected DOC's last best offer. With respect to the parties' negotiations over the 2003-05 CBA, the board found:

"During negotiation and mediation sessions for the 2003-2005 collective bargaining agreement, AOCE and DOC offered concessions on a variety of proposals and exchanged counterproposals on a number of subjects. As part of this process, DOC proposed increases in health insurance, an adjustment to the pay differential received by certain non-security employees, and a choice for each employee between accepting a one-time 'workload adjustment' payment of $350 or accepting additional leave.

"During the negotiations process, the parties reached agreement on a number of contract articles and proposals and signed off on these agreements."

OSPOA is the exclusive representative of a mixed bargaining unit of OSP employees. Its bargaining history regarding the 2003-05 CBA with OSP largely paralleled AOCE's experience with DOC. Between February 2 and June 23, 2003, OSPOA and OSP met eight times to negotiate. The board found that the parties "offered concessions on a variety of proposals, and provided counterproposals on a number of subjects. * * * OSPOA and OSP reached agreement on numerous contract articles and proposals and signed off on these agreements." As with the negotiations between AOCE and DOC, the negotiations between OSPOA and OSP included discussions regarding step increases, COLAs, and health insurance costs. The parties were unable to reach agreement, and the matter went to mediation and then arbitration.

Before arbitration, OSP's last best offer included no COLAs, and it contained a proposed letter of agreement that froze step increases for "up to twenty four (24) months from the signing of the collective bargaining agreement or the first of the month following the date of the interest arbitrator decision." The letter of agreement was made "subject to renegotiations during successor bargaining for the 2005-2007 collective bargaining agreement." OSP offered a $350 lump-sum payment like that offered in negotiations between AOCE and DOC. Finally, OSP's last best offer included a provision for full payment of health care insurance premiums for the 2004 plan year, but generally did not guarantee that employees would incur no out-of-pocket costs for the 2005 plan year.

OSPOA's last best offer was similar to AOCE's last best offer. OSPOA did not propose any COLA during the biennium, but did propose, as in a prior proposal, step increases. OSPOA also proposed that OSP pay the cost of insurance plans selected by employees for the 2004 plan year, but its offer regarding the 2005 plan year was identical to OSP's offer. If adopted, OSPOA's health insurance proposal would have remained in effect after June 30, 2005, the date on which the contract would expire.

Ultimately, the arbitrator selected OSP's last best offer. The board made findings regarding the OSPOA/OSP negotiations similar to those it made regarding the AOCE/DOC negotiations. That is, the board found that both parties made concessions, exchanged proposals, and reached agreement on a number of items.

After the arbitrations concluded, petitioners filed unfair labor practice complaints with the board, alleging that both DOC and OSP (the state) refused to bargain collectively in good faith in violation of ORS 243.672(1)(e). After a hearing, the board dismissed petitioners' complaints.

On judicial review, petitioners argue that the board erred in two respects. First, they assert, the board erred in concluding that the state did not engage in so-called "surface bargaining" in violation of the duty to bargain in good faith imposed by ORS 243.672(1)(e). Second, petitioners assert that the board erred in determining that a salary provision that will survive the term of the contract is not a permissive subject of bargaining, also contrary to ORS 243.672(1)(e). Petitioners do not argue that any of the board's factual findings are not supported by substantial evidence; accordingly, we review the board's order for errors of law. ORS 183.482(8). We begin with petitioners' "surface bargaining" claim.

Under ORS 243.672(1)(e), it is an unlawful labor practice for a public employer to "[r]efuse to bargain collectively in good faith with the exclusive representative." Surface bargaining has been described as "going through the motions of negotiating, without any real intent to reach an agreement. It violates the [National Labor Relations] Act's requirement that parties negotiate in good faith." *K-Mart*

*Corp. v. NLRB*, 626 F2d 704, 706 (9th Cir 1980) (footnote and internal quotation marks omitted).[2]

According to petitioners, "[a]ny time an employer makes a deal with a bargaining unit that no other bargaining unit will receive a better economic package it commits a *per se* violation of its duty to bargain in good faith with the other units." In petitioners' view, once the state promised SEIU that no other bargaining unit would get a better deal than it had gotten, the state's negotiations with petitioners were—as a matter of law—not conducted in good faith. Petitioners go on to argue that, even if the state's behavior did not constitute a *per se* violation of the duty to bargain in good faith, under the "totality-of-conduct" standard applied by the board, the state did not bargain in good faith.

The state responds that it was budget constraints, not the promise to SEIU, that dictated the state's position in bargaining with petitioners. In light of the state constitutional requirement of a balanced budget[3] and the economic conditions at the time, the state asserts, the legislature could not have intended that the duty to bargain in good faith precluded the state from taking the positions that it did. "[I]n enacting ORS 243.672(1)(e)," the state contends, "the legislature could not have intended that the state's decision during collective bargaining to remain within the funds available would constitute a *per se* violation of the duty to bargain in good faith." Finally, the state argues, under the board's "totality-of-conduct" standard, the state's actions did not

---

[2] In *Portland Assn. Teachers v. Mult. Sch. Dist. No. 1*, 171 Or App 616, 631 n 6, 16 P3d 1189 (2000), we explained:

"Oregon's Public Employees Collective Bargaining Act (PECBA), including ORS 243.672, was adopted to model the National Labor Relations Act (NLRA), 29 USC §§ 151-169. We therefore may look to cases decided under the federal act—and particularly to cases decided before 1973, the year in which PECBA was adopted—for guidance in interpreting PECBA. *Elvin v. OPEU*, 313 Or 165, 177, 832 P2d 36 (1992)."

[3] Article IX, section 2, of the Oregon Constitution provides: "The Legislative Assembly shall provide for raising revenue sufficiently to defray the expenses of the State for each fiscal year, and also a sufficient sum to pay the interest on the State debt, if there be any." Article IX, section 6, provides:

"Whenever the expenses, of any fiscal year, shall exceed the income, the Legislative Assembly shall provide for levying a tax, for the ensuing fiscal year, sufficient, with other sources of income, to pay the deficiency, as well as the estimated expense of the ensuing fiscal year."

amount to a failure to bargain in good faith. As did the board, we agree with the state.

■ We pause to note our standard of review. The issue addressed by the board is whether the state refused to bargain collectively "in good faith," as required by ORS 243.672(1)(e). In making that determination, the board applied its longstanding methodology for interpreting that statutory phrase. In *Olney School Dist. 11 v. Olney Education Assn.*, 145 Or App 578, 582-83, 931 P2d 804 (1997), we described our standard of review:

> "By using the phrase 'bargain collectively in good faith with the exclusive representative,' in ORS 243.672(1)(e), the legislature expressed a general legislative policy and delegated to [the board] the responsibility to complete that policy by specifying what constitutes bargaining collectively in good faith. *Springfield Education Assn. v. School Dist.*, 290 Or 217, 230, 621 P2d 547 (1980). We review to determine whether ERB's interpretation is within the range of discretion allowed by the general policy of the statute. *Id.* at 229."

*See also Wasco County v. AFSCME*, 30 Or App 863, 869, 569 P2d 15 (1977) ("Resolution of this case depends upon the meaning given to the term 'duty to bargain in good faith.' The term is used throughout ORS chapter 243, but the legislature has not defined it. Under these circumstances, [the board] is free to define the term in the way which it rationally concludes would best advance the purposes of the Public Employe[e]s' Collective Bargaining Law.") (Footnote omitted.). In this case, we defer—as we consistently have—to the board's methodology for determining whether parties have bargained in good faith. *See, e.g., AFSCME v. Board of Higher Education*, 31 Or App 251, 255, 570 P2d 388 (1977) ("This court will usually defer to the expertise-based policy formulations of an administrative agency, including the [board], especially where the agency is interpreting a broadly worded general statute.").

We turn to the board's interpretation and application of the requirement of good faith bargaining in ORS 243.672(1)(e). The board's case law interpreting that provision posits two categories of violations of the duty to bargain

in good faith. The first is a *per se* violation, premised on the idea that some conduct is "so inimical to the bargaining process that it amounts to a *per se* violation of the duty to bargain in good faith." *Amalgamated Transit Union, Division 757 v. Rogue Valley Transportation District*, 16 PECBR 559, 583 (1996) (emphasis omitted). Examples of conduct that the board has concluded amounts to a *per se* violation include (1) an employer's unilateral implementation of a change in a mandatory subject of bargaining; (2) submitting a new proposal at the mediation stage; and (3) submitting a new proposal in a final offer. *Portland Police Association v. City of Portland*, 20 PECBR 295, 310 (2003).

The second way in which any party may violate its duty to bargain in good faith is where "the totality of that party's conduct during the period of negotiations * * * indicates an unwillingness on the part of the charged party to reach a negotiated agreement." *School Employees Local Union 140 v. School District No. 1, Multnomah County*, 20 PECBR 420, 431 (2003). In its order in this case, the board explained how it applies that test:

"In applying this 'totality-of-conduct' standard, this Board analyzes the following factors to determine whether an employer's conduct indicates an unwillingness to reach agreement: (1) dilatory tactics—whether the employer used tactics that unreasonably impeded negotiation; (2) contents of the proposals—whether the employer made unduly harsh or unreasonable proposals; (3) behavior of the spokesperson—whether the negotiator's behavior was extremely discourteous; (4) concessions—whether the employer made some 'reasonable effort' to settle differences with the union; (5) failure to explain bargaining positions—whether the employer adequately explained its proposals; and (6) course of negotiations—whether the employer 'rushes through the negotiation process mandated by the PECBA,' demonstrating a lack of serious intention to reach agreement."

(Citations omitted.)

Petitioners argued to the board that the state's conduct—in promising SEIU that no other union would receive a

better contract offer than SEIU received—was a *per se* violation of the duty to bargain in good faith. The board, describing the state's promise to SEIU as a kind of "reverse parity clause," rejected petitioners' argument.[4] On appeal, petitioners reiterate their argument, asserting that the state's "actions should be seen as similar to a refusal to meet and confer and should be found a *per se* violation of the duty to bargain in good faith." In response, the state argues:

> "In light of the constitutional balanced-budget requirement, and the intent stated in ORS 291.232(1),[5] the legislature could not have intended that where it deliberately includes no money in the budget for cost-of-living or step increases, a state agency's decision to stand firm in collective bargaining and not grant such increases constitutes a *per se* violation of the duty to bargain in good faith. Such a construction would mean that, by complying with ORS 291.232(1)—electing to spend moneys appropriated in accordance with the legislatively adopted budget and the agency's enabling statutes—an agency would, **as a matter of law**, violate ORS 243.672(1)(e)."

(Boldface in original.)

We agree with that analysis and reject petitioners' argument that the state's conduct was a *per se* violation of the good faith bargaining requirement. We turn, accordingly, to

---

[4] The board likened this case to the situation in *Portland Police Association v. City of Portland*, 20 PECBR 295 (2003). In that case, the city reached a CBA with one union (DCTU) before other unions had completed their negotiations. The contract between DCTU and the city included a "parity clause," *viz.*, a provision that gave DCTU the right to choose a health care package negotiated by the other city unions, if those unions ultimately negotiated better benefits than those to which DCTU had agreed. The board rejected the argument that inclusion of the parity clause indicated *per se* bad faith.

[5] ORS 291.232(1) provides:

"It is declared to be the policy and intent of the Legislative Assembly that:

"(a) The legislatively adopted or approved budget for a state agency constitutes a determination by the Legislative Assembly of the amount needed by the agency for the biennium to meet the responsibilities imposed on the agency through the budget and through statutes governing the agency; and

"(b) Except as provided in subsections (2) and (3) of this section, appropriations from the General Fund to a state agency constitute a direction to the agency to spend the amount of moneys appropriated in order to meet the responsibilities imposed on the agency through the budget and through statutes governing the agency."

petitioners' alternative argument that the state's actions constituted a failure to bargain in good faith under the board's totality-of-conduct test.

■     Applying the three relevant factors from its six-factor test—contents of the proposals, concessions, and course of the negotiations—the board concluded that the state had not violated the good faith bargaining requirement by refusing to budge on the salary freeze issue. The board reasoned that, although the state's wage freeze proposals were "obviously unacceptable" to petitioners, those salary freeze proposals must be viewed in the totality of the circumstances surrounding the negotiations—specifically, the budget constraints under which the state was operating. And viewing the content of the salary freeze proposals, the board concluded that the state's harsh position was not a refusal to bargain in good faith. We agree. Given the economic hand it was dealt, the state's wage freeze proposals cannot be said to have been "unduly harsh or unreasonable."

Regarding the second relevant factor—any concessions—the board found, as set out above, that all parties offered concessions on a variety of proposals and exchanged counterproposals on a number of subjects. And some concessions ultimately were made. For example, DOC agreed to provide fully paid health insurance benefits for 2004 and agreed to provide each employee with a choice of a $350 "workload adjustment" payment or paid leave. OSP made similar concessions regarding the workload adjustment and health insurance. In short, although the state never wavered in its position that it could not afford to provide COLAs and step increases, the state made concessions where it could. That factor, like the first, does not support petitioners' argument that the state refused to bargain in good faith.

Finally, examination of the course of the negotiations between the state and petitioners establishes that the state did not rush through the negotiation process mandated by PECBA, "demonstrating a lack of a serious intention to reach agreement." The board found that AOCE and DOC "participated in seven collective bargaining sessions between January 22 and June 24, 2003" and at least four mediation sessions, findings that AOCE does not challenge on review.

Similarly, OSPOA and OSP participated in a number of collective bargaining and mediation sessions. As noted above, the last best offers by the state differed from its initial proposals. PECBA's definition of "collective bargaining" notes: "The obligation to meet and negotiate does not compel either party to agree to a proposal or require the making of a concession." ORS 243.660(4). The state met regularly with petitioners, made concessions, and agreed to some of petitioners' proposals.

Nonetheless, petitioners argue that the state exhibited bad faith by rejecting an offer that, petitioners assert, would have saved the state $1 million. Petitioners contend:

> "The State may have been working with a budget that included no cost-of-living or step increases, but OSPOA put a proposal on the table that would have helped the State by not having to pay out close to $1 million immediately. With OSPOA's proposal, the State would not have had to pay OSPOA steps or raises during the '03-05 biennium. The State would not consider that proposal, as it was something different than was promised to SEIU."

The testimony was equivocal about exactly how OSPOA's proposal would affect OSP's financial position in light of other considerations. Although petitioners assert that the state would not consider the proposal *because* "it was something different than was promised to SEIU," nothing in the record supports that assertion. We reject petitioners' argument that the board erred in determining that the state did not meet its obligation to bargain in good faith by insisting on a salary freeze.

Looking at the course of negotiations, the nature of the state's proposals (in light of the strict budgetary constraints under which it was operating), and the concessions made by the state, we conclude that the state did not violate its duty under ORS 243.672(1)(e) to bargain in good faith by insisting on a salary freeze like that agreed to by SEIU.[6]

---

[6] Regarding the other factors, the parties stipulated that no party engaged in dilatory tactics; that, during the course of the negotiations, the parties "behaved appropriately and professionally towards each other"; and that the parties "engaged in a reasonable period of negotiations, a reasonable number of mediation sessions * * * and following mediation continued to negotiate up to interest arbitration."

■ We turn finally to petitioners' second assignment of error, that the board incorrectly concluded that the state's wage freeze proposals did not include a permissive subject of bargaining. Again, some background is in order. "Employment relations" are defined in ORS 243.650(7). Generally, subjects are either mandatory subjects of collective bargaining or permissive subjects of collective bargaining. Mandatory subjects include direct or indirect monetary benefits, hours of employment, vacations, sick leave, grievance procedures, and other conditions of employment. ORS 243.650(7)(a). Permissive subjects of bargaining are statutorily excluded from the definition of employment relations. ORS 243.650(7)(b). The parties must bargain, in good faith, concerning mandatory subjects of bargaining. However, one party cannot force another party to bargain concerning a permissive subject. With that background in mind, we consider petitioners' second assignment of error.

The board has determined that it is an unlawful labor practice—that is, that it violates the good faith bargaining requirement in ORS 243.672(1)(e)—to submit a permissive subject of bargaining to an arbitrator without the agreement of the other party or to include a permissive subject of bargaining in a party's last best offer. Here, the state included in its last best offers to both unions a provision that the proposed wage freezes would continue for a period of "up to 24 months." Because the arbitrator's award did not become effective until April 2004, the 24-month period referred to would extend past the CBA's term; that is, it would—according to petitioners—govern salaries during the 2005-07 biennium. Petitioners note that the parties stipulated that the CBA would "be in full force and effect from the signing of this Agreement through June 30, 2005." 213 Or App at 653. According to petitioners, continuing the wage freeze past June 30, 2005, was a permissive subject because it would remain in effect after the CBA expired.

The board concluded that the provisions at issue are analogous to an "evergreen clause," a contract provision specifying that the provisions of a CBA will remain in effect during negotiations for a successor agreement. An evergreen clause, the board has held, is a mandatory subject for negotiations, so that its inclusion in a last best offer does not violate

the duty to bargain in good faith. *Association of Oregon Corrections Employees v. Department of Corrections*, 14 PECBR 832, 859-60 (1993), *aff'd*, 133 Or App 602, 892 P2d 1030, *rev den*, 321 Or 268 (1995). The board accordingly rejected petitioners' argument that the state had engaged in bad faith bargaining by proposing that provision.[7]

On review, petitioners assert that the board erred in concluding that the state did not violate the good faith bargaining requirement by proposing the "up to 24 months" provisions in the CBAs. Petitioners argue:

> "The key difference between an evergreen clause and the twenty four month step freeze is the subject matter affected by the proposal. An evergreen clause does not dictate or control a specific term of the agreement that is effective after the contract expires regardless of what is negotiated in the next agreement. An evergreen clause merely defines the status quo during negotiations. They are not analogous.
>
> "The wage freeze ties the parties' hands on wages for a period of time outside of the term covered by the CBA. DOC and OSP were able to backdoor a wage freeze for the successor contract. When the parties met to bargain the 2005-2007 agreement, bargaining unit members' steps were still frozen under the prior award. For example, the AOCE twenty four month wage freeze was implemented on May 1, 2004. Although the contract expired on June 30, 2005, the steps are frozen through April 30, 2006. That is nearly one year after the contract that dictated the wage freeze expired. The fact that a contract that expires June 30, 2005 governs a step freeze through April 30, 2006 is completely contrary to the purposes of PECBA."

(Record citation omitted.)

The state's response is straightforward. The state argues that petitioners ignore the "up to" wording in the state's last best offer, which suspended all step increases for a period of "up to 24 months." The state explains that, "contrary to the unions' assertion, the state's proposals would not

---

[7] As noted above, the board's chair concurred in that conclusion, but on the separate ground that petitioners did not adequately object to the state's proposal as permissive. We need not address that contention, as we agree with the board's majority that the proposal at issue was a mandatory subject of bargaining.

have 'tie[d] the parties' hands on wages' for a period outside the CBA. Rather, those proposals expressly left the duration of the wage freeze unsettled and expressly allowed for renegotiation of the wage freeze for the successor agreement." The state asserts that petitioners' argument is undone by the language of the state's last best offers, under which the wage freezes would not necessarily extend beyond the term of the CBAs.

We agree with the state. Regardless of whether the proposal is analogized to an evergreen clause, the last best offers simply were not proposals that necessarily would govern salary issues beyond the term of the CBAs being negotiated. The combination of the "up to 24 months" proposal and the accompanying statement that "nothing in this provision precludes the parties from reopening this subject for successor bargaining (2005-2007)" defeats petitioners' argument. In their briefing and at oral argument, petitioners suggested that the change in the state's bargaining position from a 24-month wage freeze to one that would last "up to" 24 months was somehow underhanded. But when the parties had not reached agreement by the time that the 2001-03 CBA expired, it was reasonable for the state to change its position. Indeed, that change was necessary to ensure that it was not proposing a wage freeze that would extend beyond the 2003-05 biennium, except to the extent that the parties did not reach agreement on a 2005-07 agreement before the previous one expired. Nor are we persuaded by petitioners' reference to testimony suggesting that the state's last best offers really were for 24 months, despite the express "up to" language: The proposal is unambiguous, the board found that it stated that the freeze was for "up to" 24 months, and petitioners never challenged that finding.

In summary, the board did not err in concluding that the state's hard-line bargaining position regarding the 2003-05 CBAs was dictated, not by a promise made to SEIU, but by the real budgetary constraints facing the state in difficult economic times. Moreover, the state's last best offers regarding the wage freeze did not involve permissive subjects of bargaining. Petitioners failed to demonstrate that the state did not comply with the statutory duty to bargain in good faith.

Affirmed.