197 P.3d 686 (2008)
Gary DAVENPORT, Martha Lofgren, Walt Pierson, Susannah Simpson, and Tracy Wolcot, Respondents,
v.
WASHINGTON EDUCATION ASSOCIATION, Appellant.
No. 28375-1-II.
Court of Appeals of Washington, Division 2.
December 12, 2008.
*689 Steven T. O'Ban, Ellis Li & McKinstry PLLC, Seattle, WA, for Respondents.
Judith A. Lonnquist, Law Offices of Judith A. Lonnquist, P.S., Seattle, WA, Harriet Kay Strasberg, Attorney at Law, Olympia, WA, for Appellant.
Edward Earl Younglove, III, Younglove Lyman & Coker PLLC, Olympia, WA, Joaquin M. Hernandez, Schwabe, Williamson & Wyatt, P.C., Seattle, WA, Amicus Curiae on behalf of Washington Federation of State Employees.
James D. Oswald, Law Offices of James D. Oswald, Seattle, WA, Amicus Curiae on behalf of Washington State Labor Council.
MORGAN, J.P.T.[1]
ś 1 After filing this case as a class action, the plaintiffs alleged that each of them is a representative nonmember of the Washington Education Association (WEA); that each one's employer deducted an agency shop fee from his or her salary and paid it to WEA under RCW 41.59.100 and .060(2); and that WEA later spent the money in violation of former RCW 42.17.760.[2] The trial court denied WEA's CR 12 motion for judgment on the pleadings, ruled that the statute of limitations on one of plaintiffs' claims was five years, and granted the plaintiffs' motion to certify a class. On this remand from the United States Supreme Court and the Washington Supreme Court, we hold that the plaintiffs do not have a private statutory cause of action for violating former RCW 42.17.760 or a common law cause of action for conversion, but that they do have a common law cause of action for restitution. Accordingly, we affirm, except for holding that the statute of limitations is three rather than five years.
ś 2 Since 1975, the Educational Employment Relations Act (EERA)[3] has recognized the right of public school employees[4] to form, by majority vote,[5] a union to bargain collectively[6] with their school-district employers.[7] The EERA, however, does not require that the union must be joined by every employee who benefits from its collective bargaining activity.[8] Instead, it mandates, if the union and the employer so provide in a *690 collective bargaining agreement (CBA), that each benefited employee who opts to join must pay union dues, and that each benefited employee who opts not to join must pay an "agency shop fee" equivalent to such dues.[9] It further mandates, by virtue of RCW 41.59.060(2) and .100, that the employing school district deduct dues or the equivalent "agency shop fee" from the employee's salary. RCW 41.59.060(2) states in part:
If an agency shop provision is agreed to and becomes effective pursuant to RCW 41.59.100 ... the agency fee equal to the fees and dues required of membership in the exclusive bargaining representative shall be deducted from the salary of employees in the bargaining unit.
And RCW 41.59.100 reiterates, subject to an exception not pertinent here:
If an agency shop provision is agreed to [in the CBA], the employer shall enforce it by deducting from the salary payments to members of the bargaining unit the dues required of membership in the bargaining representative, or, for nonmembers thereof, a fee equivalent to such dues.
ś 3 From 1975 until December 1992, Washington law did not restrict the manner in which a union could later spend agency shop fees after receiving them. Effective December 3, 1992, however, Washington voters enacted Initiative 134 (I-134). In Section 16 of I-134, the voters stated:
A labor organization may not use agency shop fees paid by an individual who is not a member of the organization to make contributions or expenditures to influence an election or to operate a political committee, unless affirmatively authorized by the individual.
The voters also directed in Section 33 of I-134 that Section 16 be codified in chapter 42.17 RCW, and the code reviser designated Section 16 as former RCW 42.17.760. For convenience, we refer interchangeably to Section 16 as "Section 16" or "former RCW 42.17.760."
ś 4 In August 2000, the Evergreen Freedom Foundation (EFF) complained to the Washington State Public Disclosure Commission (PDC) that WEA had used agency shop fees for political purposes without affirmative authorization from its fee-paying nonmembers. On September 25, 2000, WEA stipulated in writing, at a hearing before the PDC, that it had received and deposited agency shop fees into its general fund, that it had expended money from that fund for political purposes without its nonmembers' authorization, and that it had "committed multiple violations of former RCW 42.17.760."[10]
ś 5 In October 2000, following a referral of EFF's complaint to the Washington State Attorney General (AG), the AG filed an action (hereafter "the AG's case") related to but different from the one that we are now reviewing. The AG alleged that the public was entitled to relief in the nature of fines and penalties, but not that individual nonmembers should recover money that WEA might have spent for political purposes without their affirmative authorization. As the AG stated in a contemporaneous press release, "The lawsuit is aimed at enforcing the law on behalf of the citizens of Washington and is not intended to recover fees paid by individuals to the WEA."[11]
ś 6 In the summer or fall of 2001, the trial court held a bench trial in the AG's case. Finding that WEA had received an agency shop fee from each of about 4,000 nonmembers, and applying RCW 42.17.400(1) and.390(3), the trial court multiplied the estimated number of nonmembers by $25 and assessed a penalty in favor of the State.[12] Finding that WEA had acted intentionally, and applying RCW 42.17.400(5), the trial court doubled the penalty and awarded costs *691 and fees to the State, for a total judgment of more than half-a-million dollars.[13]
ś 7 Meanwhile, on March 19, 2001, Gary Davenport and four other nonmembers of WEA (hereafter "the Davenport plaintiffs") commenced the action that we are now reviewing (hereafter "the Davenport case"). The Davenport plaintiffs alleged in their complaint, as later amended, that WEA was a labor organization to which they had "paid mandatory agency fees in amounts equivalent to union dues," that WEA had "used their fees to influence elections and to support political committees," and that they had not authorized this use.[14] The Davenport plaintiffs also alleged that WEA had so many nonmembers during the relevant time period that it was not practical to join all of the others, that their claims were typical of the others' claims, and that they would fairly and adequately protect the interests of the class. Attaching a copy of the written stipulation that WEA had presented to the PDC, the Davenport plaintiffs asserted that WEA had violated former RCW 42.17.760, that they had a private statutory cause of action and a common law cause of action for conversion, that the case should be certified as a class action, and that they and the class should receive judgment.
ś 8 In the summer of 2001, WEA moved to dismiss the Davenport case under CR 12, and the Davenport plaintiffs moved for an order certifying a class. In January 2002, the trial court denied WEA's motion to dismiss because, in its view, the Davenport plaintiffs had adequately alleged a private statutory cause of action based on former RCW 42.17.760 and a common law cause of action for conversion. Ruling that the statutory cause was subject to the five-year statute of limitations set forth in RCW 42.17.410, and recognizing that the plaintiffs had filed their complaint on March 19, 2001, the trial court also granted the plaintiffs' motion to certify a "class of all public school employees who, between March 19, 1996 and August 31, 2001 (inclusive), were nonmembers paying agency shop fees to Defendant WEA."[15] Finally, the trial court recommended that the parties seek interlocutory review and made other rulings not pertinent here.[16]
ś 9 WEA appealed the AG's case as a matter of right and sought discretionary review in the Davenport case. We granted discretionary review in the Davenport case, with the result that both cases came before us at the same time. The main issue raised in both cases was whether former RCW 42.17.760 was unconstitutional, and hence unenforceable, because it violated the First Amendment. A majority of the panel answered yes,[17] so we dismissed both cases without reaching any other issues.[18]
ś 10 The AG in her case and the Davenport plaintiffs in theirs asked the Washington Supreme Court to review our decision. After granting review, a majority of the court[19] held that former RCW 42.17.760 violated the First Amendment, and affirmed our judgments of dismissal.[20]
ś 11 The AG in her case and the Davenport plaintiffs in theirs asked the United States Supreme Court to review the Washington Supreme Court's decision. After granting review, the high Court held that former RCW 42.17.760 did not violate the First Amendment, vacated both judgments, and remanded both cases to the Washington Supreme Court.[21]
*692 ś 12 When the Washington Supreme Court received the two cases back on remand, it decided to retain jurisdiction over the AG's case, but to transfer the Davenport case to us for further proceedings. We heard additional oral argument and invoked RAP 12.1(b) as the basis for requesting supplemental briefs on whether the Davenport plaintiffs had stated a common law cause of action for restitution.
ś 13 Having now received and reviewed the parties' supplemental briefs, we are met at the outset by WEA's reminder that the trial court has not yet made any findings of fact.[22] That is true â and immaterial to this appeal.[23] When reviewing a trial court's ruling on a motion for judgment on the pleadings brought under CR 12(c), we must take the facts alleged in the complaint, as well as hypothetical facts consistent therewith, in the light most favorable to the nonmoving party.[24] Here then, we review questions of fact by taking the facts and inferences, both real and hypothetical, in the light most favorable to the plaintiffs.[25] In contrast, we review questions of law de novo (i.e., without deferring to the trial court's reasoning or result).[26]
ś 14 With this understanding of our task on appeal, we turn now to three questions in the Davenport case: First, did the trial court properly deny WEA's motion for judgment on the pleadings? Second, did the trial court properly rule that the applicable statute of limitations was five years? Third, did the trial court properly certify a class? Throughout this opinion, we assume, in compliance with the United States Supreme Court's ruling, that former RCW 42.17.760 does not violate the United States Constitution.

I.
ś 15 The main issue is whether the trial court properly denied WEA's CR 12 motion for judgment on the pleadings. WEA claimed that the plaintiffs had failed to plead a cause of action recognized by Washington law. The plaintiffs responded that they had successfully pled a statutory cause of action based on Section 16 of I-134, as well as a common law cause of action for conversion. Coupling this history with our request for supplemental briefs, we now must decide whether the plaintiffs have stated (A) a private statutory cause of action under Section 16; (B) a common law cause of action for conversion; and/or (C) a common law cause of action for restitution.

*693 A.
ś 16 Whether the plaintiffs have stated a statutory cause of action subdivides into two questions: (1) Does former RCW 42.17.760 expressly or impliedly create a private (as opposed to a public) statutory cause of action for damages; and (2) if so, have the plaintiffs properly pled such an action here? We review the first question de novo (i.e., without deference to the trial court's reasoning or result), because it involves an issue of law.[27] We do not reach the second question because we answer the first question negatively.
ś 17 We begin our analysis of the first question by examining the rules of statutory construction. Those rules govern initiatives as well as statutes,[28] and whether a statute should be construed as creating a statutory cause of action.[29] They require that we read I-134 as an informed lay voter would have read it,[30] and in this way discern whether the 1992 voters collectively intended to create a statutory cause of action.[31] The voters' intent may appear expressly on the face of the statute itself, or it may be implied from other sources,[32] but it may not be implied from a silent record.[33]
ś 18 Applying these rules here, we first inquire whether the voters who enacted I-134 had an express intent that Section 16 be the basis for a private statutory cause of action. Section 16 clearly expresses the rule that a labor organization cannot spend a nonmember's agency shop fee for political purposes without the nonmember's affirmative authorization, but it says nothing about whether the nonmember has (or lacks) a cause of action to recover money spent in violation of its provisions. Accordingly, the voters who enacted Section 16 did not expressly exhibit intent that Section 16 be the basis for a private statutory cause of action.
ś 19 We next ask whether the voters who enacted Section 16 had an implied intent that Section 16 be the basis for a private statutory cause of action. Believing that the 1992 voters implied the absence, not the presence, of such intent, we answer no.
ś 20 When the 1992 voters enacted Section 16, they omitted to state whether they intended Section 16 to be the basis for a private statutory cause of action (i.e., a statutory cause of action that permits a nonmember to recover, in his own name and for his own account, an agency shop fee spent in violation of Section 16). Section 16 itself, its legislative history,[34] and the underlying 1992 voters' *694 pamphlet[35] are all completely silent on the point. Believing that the voters (or, perhaps more accurately, those who drafted and put the initiative before the voters for approval) would not have made such an obvious and glaring omission inadvertently, and noting the ease with which the voters (or drafters) could have expressed a private statutory cause of action,[36] we think that the omission implies the absence, not the presence, of intent to create a private statutory cause of action.
ś 21 We buttress this implication by contrasting the 1992 voters' expression of a public statutory cause of action with their omission of a private one. Since 1972, chapter 42.17 RCW has expressed a public statutory cause of action under which either the AG or the prosecuting attorney (or, if they both decline to act, a private citizen) can bring a civil action "in the name of the state for any appropriate civil remedy"[37] â provided that any judgment "shall escheat to the state," and not to the plaintiff.[38] When the 1992 voters directed in Section 33 of I-134 that Section 16 be codified as part of chapter 42.17 RCW, they manifested their intent that Section 16 be the basis of a public statutory cause of action â while simultaneously omitting to express an intent that Section 16 be the basis for a private statutory cause of action. Hence, to apply the maxim expressio unius est exclusio alterius[39] (to express one thing is to exclude another) is again to conclude that the 1992 voters implied the absence, not the presence, of intent that Section 16 be the basis for a private statutory cause of action.
ś 22 We further buttress the 1992 voters' absence of intent by noting our own decision in Crisman v. Pierce County Fire Protection District No. 21.[40] In that case, we held in effect that by expressing a public but not a private remedy, the 1992 voters had demonstrated a "goal of protecting the public rather than any individual."[41]
ś 23 Lastly, we buttress the 1992 voters' absence of intent by noting that for many years before 1992, the Washington courts had recognized a common law cause of action for restitution that the 1992 voters would have duplicated by creating a private statutory cause of action.[42] Given that the common law action already permitted an individual to recover money that he or she had transferred under circumstances constituting unjust enrichment, and that a new statutory cause of action would have had the same effect under narrower circumstances (i.e., only where the unjust enrichment was due to having violated former RCW 42.17.760), the 1992 voters (or drafters) may well have believed that a new private statutory cause of action was unnecessary.[43]
*695 ś 24 We reject for several reasons the plaintiffs' reliance on Nelson v. McClatchy Newspapers, Inc.,[44] a case in which the Washington Supreme Court seems not to have addressed, but rather to have assumed, that Section 8 of I-134,[45] a section very different from Section 16, implied a private statutory cause of action. First, we cannot tell whether the issue in Nelson was the same as the issue here; the Nelson opinion simply does not say whether Nelson was bringing a private or a public statutory cause of action.[46] Second, even if the issue was the same as the issue here, the Nelson opinion does not show that the court decided rather than assumed that Section 8 implied a private statutory cause of action. And third, even if the Nelson court decided that Section 8 implied a private statutory cause of action, the Nelson court most certainly did not decide that any other section of I-134, including but not limited to Section 16, also implied a private statutory cause of action.
ś 25 In sum, when the 1992 voters enacted Section 16, they neither expressly nor impliedly manifested an intent that Section 16 serve as the basis for a new private statutory cause of action. Necessarily then, we hold that Section 16 does not furnish such a basis.

B.
ś 26 The next issue here is whether the plaintiffs have a common law cause of action for the tort of conversion. Rooted in the common law action of trover,[47] that tort occurs when, without lawful justification, one willfully interferes with, and thereby deprives another of, the other's right to a chattel.[48] It requires that the plaintiff have a possessory or other "property interest" in the chattel,[49] and it treats money as a chattel only if the defendant "wrongfully received" the money or "was under obligation to return the specific money to the party claiming it."[50] Absent a "property interest" of the required type, an action for conversion will not lie, for at most the defendant has only failed to pay an unsecured debt.[51]
*696 ś 27 Taking the plaintiffs' allegations in the light most favorable to them, we begin by observing that WEA might have converted the Davenport plaintiffs' money at either or both of two different times. The earlier time was when WEA received the money from each plaintiff's employer. The later time was when WEA used the money for political purposes.
ś 28 To determine whether WEA committed the tort of conversion when it initially received money from each plaintiff's employer, we must ascertain whether WEA initially received the money "wrongfully" or "with lawful justification." When the legislature enacted RCW 41.59.100 and .060(2), it authorized each nonmember's employer to deduct from the plaintiff's salary, and pay to WEA (or other labor organization), money that had been earned by the nonmember. Necessarily, it also authorized WEA (or other labor organization) to receive that same money. Having received the money with lawful justification, WEA did not commit the tort of conversion at that time.
ś 29 To determine whether WEA committed the tort of conversion when it later used the money for political purposes, we must ascertain whether each plaintiff had a "property interest" in the money when WEA later used it. Before former RCW 42.17.760 took effect (i.e., before December 3, 1992), RCW 41.59.100 and .060(2) mandated that each nonmember's employer transfer to WEA money that otherwise would have belonged to the nonmember. Because nothing in the Washington law that existed at that time restricted the manner in which WEA could later use the money, the transfer was unconditional, WEA became the sole owner and possessor of the money transferred, and the nonmember did not obtain the "property right" necessary for conversion.
ś 30 When former RCW 42.17.760 was enacted in 1992, it unquestionably restricted (conditioned) WEA's ability to use the transferred money for political purposes. But did it also create or resurrect in each nonmember the kind of "property interest" that he or she must show in order to sue for conversion? We think not. Reading the former statute according to its plain terms, we see nothing that speaks to the existence of such an "interest." The statute is simply silent on that point, and we are not willing to infer the creation of such an interest from its silence. Accordingly, we conclude that the plaintiffs do not have the kind of "property interest" that they need to sue for conversion, and that they have not stated a cause of action for that tort.

C.
ś 31 That the plaintiffs lack a common law cause of action for conversion does not necessarily mean that they cannot recover in this case. In Seekamp v. Small,[52] the trial court granted a new trial because the plaintiff had not proved a common law cause of action for conversion. On appeal, the Washington Supreme Court held that even though the plaintiff had not proved a common law cause of action for conversion,[53] the plaintiff had proved a common law action for restitution (which the court termed "[a]n action for money had and received"[54]). The court explained:
[T]he failure of [the plaintiff] to prove a cause of action in conversion does not of itself justify the granting of a new trial. The complaint contained allegations sufficient to state a cause of action for money had and received and the record is replete *697 with evidence, admitted without objection, entitling [the plaintiff] to recover on that cause of action....
In Bosworth v. Wolfe, 146 Wash. 615, 264 P. 413, 417, 56 A.L .R. 1117, we said: "The action for money had and received was invented by the common-law judges to secure relief from the narrower restrictions of the common-law procedure, which afforded no remedy in too many cases of merit. The action is a modified form of assumpsit. It has gone through various transformations; first from tort, then from contract, and afterwards into a remedy where there was technically neither tort nor contract. It is founded on the principle that no one ought unjustly to enrich himself at the expense of another, and the gist of the action is that the defendant has received money which in equity and good conscience should have been paid to the plaintiff, and under such circumstances that he ought, by the ties of natural justice, to pay it over."[[55]]
Accordingly, the next issue here is whether the Davenport plaintiffs have alleged the facts needed for a common law cause of action for restitution.
ś 32 Sometimes termed a cause of action for "a contract implied in law"[56] "quasi contract,"[57] or "money had and received,"[58] the common law action for restitution employs unjust enrichment as an independent basis of substantive liability.[59] The Restatement of Restitution and Unjust Enrichment (Third) states:
A more important misconception is that restitution is essentially a remedy, available in certain circumstances to enforce obligations derived from torts, contracts, and other topics of substantive law. On the contrary, restitution (meaning the law of unjust or unjustified enrichment) is itself a source of obligations, analogous in this respect to tort or contract. A liability *698 in restitution is enforced by restitution's own characteristic remedies, just as a liability in contract is enforced by what we think of as contract remedies.[[60]]
Unlike the law of conversion, which requires that the transferee have wrongfully received the property of another,[61] the law of restitution requires only that the transferee have received the property of another under circumstances that result in the transferee's "unjust enrichment."[62]
ś 33 The Washington Supreme Court embraced or re-embraced these general principles in Nelson v. Appleway Chevrolet, Inc.[63] Nelson wanted to buy a car from a car dealer. Nelson and the dealer's representative agreed on the price Nelson would pay for a car â which the dealer then refused to deliver unless Nelson paid an additional "$79.23 for business and occupation (B & O) tax."[64] Nelson transferred (paid) the $79.23 under protest[65] and filed a class action lawsuit in which the parties debated whether a statute, RCW 82.04.500, permitted B & O tax to be passed through to the customer. Answering no, our Supreme Court held that because Nelson had "brought an independent claim of restitution" under the common law, there was no need to address "whether RCW 82.04.500 implies a private right of action."[66] Explaining Nelson's right to bring "an independent claim of restitution," the court said:
The new Restatement (Third) of Restitution addresses the confusion surrounding unjust enrichment claims. While historically understood as an equity action, restitution has roots in both equity and the law. See Restatement (Third) of Restitution and Unjust Enrichment, § 1 cmt. b (Discussion Draft 2000). The original justification, dating back to Lord Mansfield's decision in Moses v. Macferlan has given way to a modern understanding, based on a transaction's legal validity. Specifically, any transaction not adequately supported by law is voidable. See Restatement (Third) of Restitution, supra, § 1 cmt. b at 3 ("Unjustified enrichment is enrichment that lacks an adequate legal basis: it results from a transfer that the law treats as ineffective to work a conclusive alteration in ownership rights."). Because Appleway illegally charged Nelson the B & O tax as an additional cost to the final purchase price, Appleway has been unjustly enriched with money properly belonging to Nelson. In effect, Appleway has made Nelson pay Appleway's taxes. Furthermore, restitution is more than a simple contract remedy. It is "itself a source of obligations, analogous in this respect to tort or contract." Id., § 1, cmt. h at 12-13.[[67]]
ś 34 Although "enrichment" is easy to define, it will not by itself support restitution. One person "enriches" another merely by transferring money or other benefit to the other.[68] But a transferee who receives money *699 or other benefit is not liable for restitution unless "the circumstances of its receipt or retention are such that, as between the two persons, it is unjust for him [or her] to retain it."[69]
ś 35 In contrast, "unjust" enrichment is quite difficult to define. According to both the Restatement (Third) and Nelson v. Appleway, it "results from a transfer that the law treats as ineffective to work a conclusive alteration of ownership rights."[70] According to the Restatement (Third), one type of transfer that will be ineffective for this purpose is the one "subject to avoidance," and one type of transfer that will be subject to avoidance is the one "made under legal compulsion"[71] â "if it can subsequently be established that the legal compulsion has been misapplied, inducing a transfer that was not justified in terms of the underlying rights and obligations of the parties."[72] As the Restatement (Third) explains:
[T]he use of legal compulsion to effect a transfer presupposes a conclusion about the distribution of property between transferor and transferee â the conclusion being that justice (whether embodied in the law of civil obligations or the tax code) requires a transfer from one to the other. If that conclusion about the parties' proper entitlements is subsequently revealed to be erroneous, the effect of the legal compulsion will have been to create an improper distribution, rather than to redress one. Restitution in such a case is supported not merely by considerations of private justice between the parties, but by recognition of the fact that the misapplication of the state's coercive means deprives them of their ordinary justification as legalized coercion.[[73]]
The law of Washington has long been in agreement.[74]
ś 36 As the following authorities show, a transfer made under compulsion of law creates rather than redresses "an improper distribution" in at least two instances. In one, the initial transfer is compelled, either in whole or in part, by an unlawful or mistaken view of the law. In the other, the initial transfer is lawfully compelled ab initio, subject to a condition the later failure of which deprives it of its initially lawful justification and makes retention of its benefits currently unjustifiable.
ś 37 Transfers of the first kind are exemplified in Broward County v. Mattel,[75]Rosen *700 v. Village of Downers Grove,[76] Investors Title Company, Inc. v. Hammonds,[77]In re Increase in Fees by the New Jersey Board of Dentistry,[78] and Five Boro Electrical Contractors Association, Inc. v. City of New York.[79] In Broward County v. Mattel,[80] the lawyers practicing in Broward County continued to pay (transfer) license fees to the county without protest â apparently not realizing that the statute authorizing the county to exact such fees had been repealed. When the lawyers belatedly discovered the repeal, they sued for restitution. The Florida Court of Appeals held that the lawyers had paid involuntarily (i.e., under "coercion and duress") despite their failure to protest; that "if the payment of a tax is deemed involuntary, a tax which was unlawfully collected may be recovered back by appropriate action,"[81] and hence that the lawyers were entitled to restitution.
ś 38 In Rosen,[82] a plaintiff named Firestone believed that it had to comply with a local ordinance before it could receive the permits that it needed for a proposed subdivision. To comply, it paid (transferred) more than $7,000 to the local school district. A court later declared the ordinance invalid, and Firestone sought restitution. Finding that Firestone had paid "not voluntarily but under compulsion and duress,"[83] the trial court ordered restitution, and the Illinois Supreme Court affirmed.
ś 39 In Investors Title,[84] a county recorder of deeds employed a fraudulent head cashier who routinely charged fees for recording documents that were higher than the applicable statute allowed. The plaintiff title company did not discover the overcharges for six years, but when it did, it sued the county for restitution. Holding that the county's "acceptance and retention of the overcharged fees was unjust,"[85] the Missouri Supreme Court ordered restitution of the overcharged amounts.
ś 40 In New Jersey Board of Dentistry,[86] a statute authorized the New Jersey Board of Dentistry to adopt a rule that would base the license fees for dentists on the amounts required by the Board to meet its expenses â provided that such fees "not be fixed at a level that will raise amounts in excess of the amount estimated to be so required."[87] Claiming that the Board had adopted a new fee schedule that generated "amounts in excess of the amount estimated to be so required," the New Jersey Dental Association sought review by the Appellate Division, apparently on two grounds: (1) that the Board had exceeded its authority by adopting the new fee schedule, and (2) that the Association's members were entitled to restitution of amounts collected under it. The Appellate Division ruled for the Association on the first ground, but neglected to rule on the second. Neither party timely sought further review, prompting some appellate churning, but the case nevertheless wound up before the New Jersey Supreme Court. Apparently declining to review the first issue due to the parties' failure to timely appeal from the Appellate Division, the Supreme Court reviewed the second issue, granted restitution, and remanded "for the calculation and distribution of a refund based on the difference between the fees collected during the years in question and the Board's actual expenses during those years."[88]
*701 ś 41 In Five Boro,[89] the city charged license fees in amounts later ruled "excessive" because they lacked a "reasonable relationship to the costs of the services involved in issuing the licenses."[90] Licensees who had paid without protest obtained a trial court judgment "representing the excess over $25 apiece,"[91] and the city appealed. Holding that the plaintiffs had paid under compulsion despite the absence of any protest, the New York Court of Appeals ordered restitution of the excess amounts.
ś 42 Transfers of the second type are exemplified by RAP 12.8, Karpierz v. Easley,[92] and Wareham Education Association v. Labor Relations Commission.[93] RAP 12.8 provides that if a judgment debtor pays rather than supersedes all or part of a judgment pending appeal, but the judgment is later reversed or modified before becoming final, the trial court must "restore to the [judgment debtor] any property taken from [the judgment debtor], the value of the property, or in appropriate circumstances, provide restitution."[94] Both Restatements provide likewise.[95] In effect, these authorities recognize that a judgment debtor initially pays not because he wants to, but because of the judgment's lawful coercive effect â an effect that is entirely justifiable while the judgment is presumed valid and enforceable pending appeal, but which ceases to be justifiable once the judgment has been reversed or modified. In alternative terms, these authorities recognize that even though the initial transfer (the judgment debtor's payment of the judgment pending appeal) was lawfully coerced when first made, it was subject to a condition subsequent (the judgment being affirmed on appeal) that later failed (when the judgment was reversed or modified on appeal). This failure strips the transfer of its initial justification and renders "unjust" the transferee's (the judgment creditor's) present retention of the judgment debtor's property. Hence, restitution is warranted.
ś 43 In Karpierz,[96] Kansas City police officers searched Karpierz' house and lawfully seized over $34,000 in cash. The officers were required by state law to follow certain statutory procedures before making the cash available for federal forfeiture proceedings, but they neglected to do that, leading Karpierz to sue for restitution. Concluding that restitution was required, the Missouri Court of Appeals held that even though the officers had acted lawfully in initially seizing the money, they later "had an obligation to handle the seized money in the manner prescribed by statute"; that the officers had violated their later obligation by "unlawfully transfer[ing] the money to federal authorities"; and that "allowing [the officers] to benefit from ignoring the requisite statutory procedures would constitute unjust enrichment."[97] Stated alternatively, the court held that even though the initial transfer (the officers' lawful seizure of the $34,000) was completely lawful, the transfer remained subject to a statutory condition (compliance with state statutory procedures before turning the *702 money over for federal forfeiture), the later failure of which deprived the initial transfer of its justification and warranted restitution.
ś 44 In Wareham,[98] the plaintiffs were teachers who had opted not to join a teacher's union. They complained to the Massachusetts Labor Relations Commission that they had been required to pay agency shop fees even though they had never received, when they paid or later, independently audited statements of revenues and expenses as mandated by the United States Supreme Court in Chicago Teachers Union v. Hudson.[99] The Commission sustained the complaint and ordered restitution. The Supreme Judicial Court of Massachusetts affirmed, subject to the unions' right "to renew their demands for any fees to which they may be entitled once they comply with the requirements of [Hudson, 475 U.S. 292, 106 S.Ct. 1066]."[100] As in Karpierz, the court seems to have said that even if the initial transfer (the deduction of money from the plaintiffs' salaries) was lawful, it remained subject to a condition (the availability of independently audited statements of revenues and expenses), the later failure of which deprived the transfer of justification and warranted restitution.[101]
ś 45 In this case, the significant circumstances are similar to those in RAP 12.8, Karpierz, and Wareham. The initial transfer of money occurred when, just before issuing each plaintiff's paycheck, each plaintiff's employer deducted an agency shop fee that it then paid to WEA. Although this initial transfer was compelled by law (RCW 41.59.060, RCW 41.59.100, and the applicable CBA), so that it was lawful when made, it was also subject to the statutory condition, embodied in former RCW 42.17.760, that WEA not later spend the money for political purposes without each plaintiff's affirmative authorization. Assuming the statutory condition later failed, it deprived the initial transfer of its justification and rendered unjust WEA's retention of its benefits. Taking the real and hypothetical facts in the light most favorable to the Davenport plaintiffs, we hold they have a common law cause of action for restitution.[102]
*703 ś 46 Citing Hawkinson v. Conniff,[103] WEA claims that "the voluntary payment doctrine constitutes a complete affirmative defense to any claim for restitution based upon unjust enrichment."[104]Hawkinson provides:
[M]oney voluntarily paid under a claim of right to the payment, and with knowledge by the payor of the facts on which the claim is based, cannot be recovered on the ground that the claim was illegal, or that there was no liability to pay in the first instance.[[105]]
ś 47 "The voluntary payment doctrine" does not apply in this appeal because nothing shows that the plaintiffs paid voluntarily.[106] On the contrary, the record shows that money was transferred by each plaintiff's employer to WEA not because the plaintiff was voluntarily agreeing to pay, but because the transfer was compelled by RCW 41.59.100 and .060(2).
ś 48 WEA argues that the plaintiffs paid voluntarily because they were offered but did not take an opportunity to opt out. We cannot agree. Former RCW 42.17.760 conditioned WEA's retention of benefits on the plaintiffs' affirmative authorization, not merely on their silence in the face of an opportunity to opt out. Moreover, it appears that the opportunity to opt out was offered after the initial transfer (deduction), and thus that it cannot have affected the voluntariness of the plaintiff's conduct when the transfer took place. Concluding again that the plaintiffs have stated a common law action for restitution, we hold that WEA's CR 12 motion to dismiss was properly denied.

II
ś ś 49 The next issue is whether the trial court applied the correct statute of limitations. As the plaintiffs correctly point *704 out,[107] the statute of limitations applicable to a private statutory cause of action brought under chapter 42.17 RCW is five years.[108] As WEA correctly points out,[109] the statute of limitations applicable to a common law cause of action for unjust enrichment (which, as noted above, is equivalent to a cause of action for restitution or implied in law contract) is three years.[110] Having held that the plaintiffs have a cause of action for restitution and unjust enrichment, but not a private statutory action under chapter 42.17 RCW, we conclude that the three-year statute of limitations applies here, and we direct the trial court to modify its class certification accordingly.[111]

III.
ś 50 The last issue for today is whether the trial court erred by certifying a class. We review its action only for abuse of discretion,[112] and we perceive no abuse here.
ś 51 For all of the foregoing reasons, we affirm and remand for further proceedings, except that on remand the trial court shall modify its class certification to reflect a three rather than a five-year statute of limitations.
I concur: HUNT, J.
BRIDGEWATER, J. (dissenting in part).
ś 52 I agree with the majority that the Davenport plaintiffs do not have a private cause of action for WEA's alleged violations of former RCW 42.17.760 (Laws of 1993, ch. 2, § 16). I also agree that the plaintiffs do not have a conversion claim for the nonmember fees at issue. However, to the extent the majority provides the plaintiffs with a restitution cause of action, which the plaintiffs did not seek in their complaint and which is not available to them in any event, I respectfully dissent.
ś 53 As a threshold matter, I note that following oral argument in this remanded case, we asked the parties for supplemental briefing regarding whether "the undisputed facts support a claim for restitution." Order Requesting Additional Briefing (May 13, 2008). In responding, the Davenport plaintiffs acknowledged that restitution is both a substantive cause of action based on unjust enrichment, and a remedy for a contract or tort claim. As to any substantive claim, the Davenport plaintiffs admit that their amended complaint does not assert a cause of action for unjust enrichment. And indeed, the amended complaint does not mention restitution at all. They contend, however, that because CR 15(a) permits liberal amendment of pleadings,[113] this court has the discretion to remand and permit the plaintiffs to add the unjust enrichment claim, which was broached for the first time on appeal. They further argue, however, that adding a new claim is not necessary, because restitution is an appropriate remedy for the causes of action that were presented in their amended complaint.
*705 ś 54 Given the present procedural posture of this case, the Davenport plaintiffs' amendment contention is both inappropriate and irrelevant. We are now reviewing whether the trial court properly denied WEA's CR 12(c) motion for judgment on the pleadings. Accordingly, our present inquiry concerns what assertions and facts were before the trial court when the motion was denied. Judgment on the pleadings is reviewed de novo, and "we examine the pleadings to determine whether the claimant can prove any set of facts, consistent with the complaint, which would entitle the claimant to relief." N. Coast Enters., Inc. v. Factoria P'ship, 94 Wash.App. 855, 858-59, 974 P.2d 1257, review denied, 138 Wash.2d 1022, 989 P.2d 1137 (1999) (emphasis added); cf. Roth v. Bell, 24 Wash.App. 92, 94, 600 P.2d 602 (1979) ("In making the essentially legal determination [under CR 12(b)(6)] of whether there is any state of facts that the plaintiffs could prove entitling them to relief under their claim, we accept as true the factual allegations of the complaint and, where necessary, those facts raised for the first time on appeal." (Emphasis added.)). While we may consider hypothetical facts when reviewing a decision on a CR 12(c) motion, we are nevertheless constrained by what claims were made to the trial court. Accordingly, consideration of claims that were not before the court below is inappropriate.
ś 55 Regarding restitution as a remedy, the Davenport plaintiffs argue in essence that such a remedy would be appropriate because each of their claims is based on WEA's misuse of the plaintiffs' money. Similarly, the majority holds that WEA's subsequent failure to comply with former RCW 42.17.760's requirements make the agency fees at issue available to the plaintiffs under a restitution theory. See majority at 702-03.[114]
ś 56 In my view the Washington Supreme Court's prior opinion in this case resolves the matter of whose money is at issue. In the prior treatment of this case, our state Supreme Court analyzed the provisions and effect of former RCW 42.17.760, its interplay with other portions of chapter 42.17 RCW, and other relevant legislation. The court also determined that former RCW 42.17.760 violated the First Amendment. See State ex rel. Wash. State Pub. Disclosure Comm'n v. Wash. Educ. Ass'n., 156 Wash.2d 543, 568-71, 130 P.3d 352 (2006), rev'd sub nom., Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007). The United States Supreme Court reversed on the federal constitutional question and remanded. Davenport, 127 S.Ct. at 2383. But the reversal on the federal constitutional issue does not otherwise affect our state Supreme Court's interpretation of chapter 42.17 RCW, and we are bound by our state Supreme Court's interpretation of state law. See State v. Gore, 101 Wash.2d 481, 487, 681 P.2d 227 (1984) ("once this court has decided an issue of state law, that interpretation is binding on all lower courts until it is overruled by this court"). I now turn to that decision.
ś 57 Under RCW 41.59.060(2) and RCW 41.59.100, WEA is authorized to collect fees and dues from union members and to collect equivalent agency fees from nonunion members. Accordingly, WEA is statutorily empowered to collect and possess agency fees. Former RCW 42.17.760 provides that a labor organization "may not use" agency shop fees for political expenditures "unless affirmatively authorized by the individual" who paid the fees. By its terms, former RCW 42.17.760 limits the union's use of the fees, but not its right to collect or possess them. As our state Supreme Court has determined, former RCW 42.17.760 "acknowledges that the fees are in the union's possession but places restrictions on the use of the union's funds for political speech." See State ex rel. Wash. State Pub. Disclosure Comm'n, 156 Wash.2d at 569, 130 P.3d 352 (second emphasis added).
ś 58 I acknowledge the United States Supreme Court's subsequent remark in Davenport v. Washington Education Association, describing former RCW 42.17.760 as a "condition *706 placed upon the union's extraordinary state entitlement to acquire and spend other people's money." See Davenport, 127 S.Ct. at 2380. I also recognize, as explained below, that the comment is dicta and is not binding. See State v. Potter, 68 Wash.App. 134, 149 n. 7, 842 P.2d 481 (1992) (dicta is language not necessary to the decision in a particular case); see also Blackburn v. Safeco Ins. Co., 49 Wash.App. 423, 425, 744 P.2d 347 (1987), aff'd, 115 Wash.2d 82, 794 P.2d 1259 (1990) (dicta is not binding).
ś 59 In Davenport, Justice Scalia writing for the Supreme Court framed the issue as follows:
The State of Washington prohibits labor unions from using the agency-shop fees of a nonmember for election-related purposes unless the nonmember affirmatively consents. We decide whether this restriction, as applied to public-sector labor unions, violates the First Amendment.

Davenport, 127 S.Ct. at 2376 (emphasis added). The Supreme Court concluded as follows: "We hold that it does not violate the First Amendment for a State to require that its public-sector unions receive affirmative authorization from a nonmember before spending that nonmember's agency fees for election-related purposes." Davenport, 127 S.Ct. at 2383 (emphasis added).
ś 60 In the course of its analysis, the Supreme Court stated, "As applied to public-sector unions, [former RCW 42.17.760] is not fairly described as a restriction on how the union can spend `its' money; it is a condition placed upon the union's extraordinary state entitlement to acquire and spend other people's money." Davenport, 127 S.Ct. at 2380. This comment was made in the context of the Supreme Court's rejecting WEA's attempt to apply in this circumstance Supreme Court cases that directed rigorous First Amendment scrutiny. See Davenport, 127 S.Ct. at 2380. WEA's argument built upon "the Washington Supreme Court's description of [former RCW 42.17.760] as encumbering funds that are lawfully within a union's possession." Davenport, 127 S.Ct. at 2380. WEA then argued that "[former RCW 42.17.760] is a limitation on how the union may spend `its' money," and relied on the First Amendment rigorous scrutiny cases to argue that former RCW 42.17.760 was unconstitutional because it applied to ballot propositions and did not limit equivalent election-related expenditures by corporations. Davenport, 127 S.Ct. at 2380. In rejecting WEA's attempt to apply federal First Amendment cases in this context, the Supreme Court stated:
The Supreme Court of Washington's description of [former RCW 42.17.760] notwithstanding, our campaign-finance cases are not on point. For purposes of the First Amendment, it is entirely immaterial that [former RCW 42.17.760] restricts a union's use of funds only after those funds are already within the union's lawful possession under Washington law. What matters is that public-sector agency fees are in the union's possession only because Washington and its union-contracting government agencies have compelled their employees to pay those fees. The cases upon which respondent relies deal with governmental restrictions on how a regulated entity may spend money that has come into its possession without the assistance of governmental coercion of its employees. As applied to public-sector unions, [former RCW 42.17.760] is not fairly described as a restriction on how the union can spend "its" money; it is a condition placed upon the union's extraordinary state entitlement to acquire and spend other people's money.
Davenport, 127 S.Ct. at 2380 (first italics added) (citations omitted).
ś 61 As can be seen, the Supreme Court was rejecting the application of its First Amendment cases as WEA was trying to apply them. The Supreme Court did not, however, reject the notion that the money was lawfully in WEA's possession. Although the Supreme Court throughout the opinion describes WEA's collection of agency fees as extraordinary, it also acknowledged the propriety of that circumstance under state law. The Supreme Court recognized that:
The State of Washington has authorized public-sector unions to negotiate agency-shop agreements. Where such agreements are in effect, Washington law allows *707 the union to charge nonmembers an agency fee equivalent to the full membership dues of the union and to have this fee collected by the employer through payroll deductions.
Davenport, 127 S.Ct. at 2377 (citing RCW 41.56.122(1), 41.59.060(2), 41.59.100). The Supreme Court further stated:
The public-sector agency-shop arrangement authorizes a union to levy fees on government employees who do not wish to join the union. Regardless of one's views as to the desirability of agency-shop agreements, it is undeniably unusual for a government agency to give a private entity the power, in essence, to tax government employees. As applied to agency-shop agreements with public-sector unions like respondent, [former RCW 42.17.760] is simply a condition on the union's exercise of this extraordinary power, prohibiting expenditure of a nonmember's agency fees for election-related purposes unless the nonmember affirmatively consents.
Davenport, 127 S.Ct. at 2378 (emphasis added) (citation omitted). The Supreme Court went on to conclude that former RCW 42.17.760's affirmative authorization requirement does not offend the First Amendment. Davenport, 127 S.Ct. at 2383.
ś 62 As these passages demonstrate, the Supreme Court simply decided a narrow constitutional issue. A careful reading of the decision reveals that the Supreme Court did not disapprove or contradict the notion that the agency fees were lawfully collected by WEA. Accordingly, we are bound by the Washington Supreme Court's determination that WEA lawfully collected and held the agency fees in its possession, and that former RCW 42.17.760 places "restrictions upon the use of the union's funds." See State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 569, 130 P.3d 352 (second emphasis added). The majority agrees that the WEA became "the sole owner and possessor of the money transferred." Majority at 696 (see its discussion regarding "conversion").
ś 63 I disagree with the majority that restitution is available in any event under the circumstances of this case. Restitution is available where one person is unjustly enriched at the expense of another. Dragt v. Dragt/DeTray, LLC, 139 Wash.App. 560, 576, 161 P.3d 473 (2007), review denied, 163 Wash.2d 1042, 187 P.3d 269 (2008). Unjust enrichment is an equitable principle. Dragt, 139 Wash.App. at 576, 161 P.3d 473. "A person has been unjustly enriched when he has profited or enriched himself at the expense of another contrary to equity." Dragt, 139 Wash.App. at 576, 161 P.3d 473 (emphasis added).
ś Enrichment alone will not trigger the doctrine; "the enrichment must be unjust under the circumstances and as between the two parties to the transaction." Dragt, 139 Wash.App. at 576, 161 P.3d 473 (emphasis added). "Three elements must be established for unjust enrichment: (1) there must be a benefit conferred on one party by another, (2) the party receiving the benefit must have an appreciation or knowledge of the benefit, and (3) the receiving party must accept or retain the benefit under circumstances that make it inequitable for the receiving party to retain the benefit without paying its value." Dragt, 139 Wash.App. at 576, 161 P.3d 473 (emphasis added).
ś 64 The majority holds that assuming WEA violated former RCW 42.17.760's preauthorization requirements, such violation rendered its retention of the agency fees unjust, thereby triggering the availability of restitution. See majority at 702-03. This approach fails for two reasons. First, the nature of the interest arising under RCW 42.17.760 and devolving to nonmember payers of agency fees is a limited interest. WEA could have used the money in question for any expenditure apart from political purposes â e.g. negotiation expenses, travel, meals, lodging, conference expenses. As noted, former RCW 42.17.760 places an additional burden on the union to first seek affirmative authorization from the individual payer of the fee before the union may use for political purposes the fee that is lawfully in the union's possession. Accordingly, the interest devolving to the payer under former RCW 42.17.760 is essentially a veto power on the use of the fee, and does not arise until and unless the union seeks to use the fee for political purposes. Thus, the limited interest *708 arising from the statute may best be described as contingent or inchoate, but not possessory.[115]
ś 65 Secondly, a prerequisite for restitution is not met here. WEA's retention of the agency fees is not contrary to equity under the circumstances. "Equity seeks fairly to protect all parties who act fairly." Chambers v. Cranston, 16 Wash.App. 543, 546, 558 P.2d 271 (1976), review denied, 89 Wash.2d 1006 (1977). Moreover, as explained in Nugget Properties, Inc. v. Kittitas County, 71 Wash.2d 760, 767, 431 P.2d 580 (1967):
Acquiescence consisting of mere silence may also operate as a true estoppel in equity to preclude a party from asserting legal title and rights of property, real or personal, or rights of contract.... A fraudulent intention to deceive or mislead is not essential. All instances of this class, in equity, rest upon the principle: If one maintain silence when in conscience he ought to speak, equity will debar him from speaking when in conscience he ought to remain silent.
(Quotation marks and citation omitted.). In my view, when weighing equities in this case, the Davenport plaintiffs' silence and failure to act when they were invited to get their agency fees rebated weighs heavily against them.
ś 66 Here, a sufficient avenue was available to ensure nonmembers' rights not to participate in the union's political activities, and included a nonjudicial procedure to obtain rebates of that portion of the agency fees that would go to support the union's political activities. A process by which the union notifies the nonmember of its political activities and provides for rebates of fees to dissenting nonmembers was established by the United States Supreme Court in Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986). As the Washington Supreme Court determined, those procedures were followed here. See State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 549-51, 130 P.3d 352.
ś 67 During the relevant time period (1996 to 2000) WEA sent a "Hudson packet" twice each year to each nonmember. The packet provided financial information about WEA and its activities. The packet also included a letter notifying the employee of his or her right to object to paying fees for the union's political expenditures (nonchargeable expenditures). The packet gave the nonmember three choices: (1) pay agency shop fees equivalent to 100 percent of dues; (2) object to paying 100 percent and receive a rebate of nonchargeable expenditures, as calculated by WEA; or (3) object to paying 100 percent and challenge WEA's calculations of nonchargeable expenditures. See State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 550, 130 P.3d 352.
ś 68 When a nonmember challenged WEA's calculation of nonchargeable expenditures, an arbitrator determined the amount of the nonmember's fees that should be rebated. Pending the outcome of the arbitration, WEA escrowed any fees that were reasonably in dispute. WEA rebated to the employee the amount determined by the arbitrator, and transferred the remainder to WEA's general account. During the years 1996 to 2000, the rebates ranged from $44 to $76. See State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 550-51, 130 P.3d 352. Nonmembers who did not object and did not request rebates did not receive rebates. Their fees were transferred from escrow to WEA's general account from which political expenditures were made. See State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 551, 130 P.3d 352.
ś 69 As can be seen, the Hudson procedures followed here notify nonmembers of the union's political activities and essentially *709 invite nonmembers to obtain rebates through a convenient, nonjudicial procedure in instances where they do not agree with the union's political activities. As the Washington Supreme Court determined, these procedures "protect dissenters' rights not to participate in the union's political speech." State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 569, 130 P.3d 352.[116]
ś 70 To summarize, our Supreme Court has determined that the agency funds at issue are WEA's funds, and that the Hudson procedures employed by WEA protect the plaintiffs' rights. Also, any interest devolving to agency fee payers under former RCW 42.17.760 is contingent and limited. Moreover, the plaintiffs here failed to use the simple, non-judicial rebate mechanism available to them under the Hudson procedures. Under these circumstances, balancing the equities, it cannot be said that WEA's retention of the agency fees is unjust. Accordingly, restitution is not triggered. Dragt, 139 Wash.App. at 576, 161 P.3d 473.
ś 71 I additionally observe that Nelson v. Appleway Chevrolet, Inc., 160 Wash.2d 173, 157 P.3d 847 (2007), upon which the majority relies to bolster its decision to provide a cause of action for restitution, is inapposite.[117] First, the case is factually distinguishable in several ways: (1) it dealt with a sales transaction, (2) the defendant car dealership took money from its customers in violation of a statute,[118] and (3) the customer plaintiffs asserted a claim for unjust enrichment. None of those circumstances is present here. Also, in Nelson a claim for unjust enrichment was the only means that plaintiffs had to recover money that had been improperly taken from them by the dealership. Again, that is not the case here because the Davenport plaintiffs have a nonjudicial means of recovery (i.e. the Hudson procedures) as to the agency fees in question; but plaintiffs here failed to utilize that process. Moreover, in light of the facts of Nelson, application of restitution as an equitable remedy makes more sense in that case than in the Davenport case.
ś 72 Aside from being factually distinguishable, the rationale utilized in Nelson is not applicable here. Relying on a tentative draft of the Restatement (Third) of Restitution, Nelson explained that:
The original justification [for restitution]... has given way to a modern understanding, based on a transaction's legal validity. Specifically, any transaction not adequately supported by law is voidable. See [Restatement (Third) Of Restitution And Unjust Enrichment § 1 cmt. b at 3 (Discussion Draft 2000)] ("Unjustified enrichment is enrichment that lacks an adequate legal basis: it results from a transfer that the law treats as ineffective to work a conclusive alteration in ownership rights."). Because Appleway illegally charged Nelson the B & O tax as an additional cost to the final purchase price, Appleway has been unjustly enriched with money properly belonging to Nelson.

Nelson, 160 Wash.2d at 187-88, 157 P.3d 847 (emphasis added). As noted, there is no similar "transaction" in the present case. As previously discussed, the union properly obtained the agency fees from the plaintiffs as authorized by statute. Accordingly, the union legally possessed the funds, our Supreme Court has so held, and we are bound by that determination. Thus, the present case does not concern an improper transfer of possessory interest as was the case in Nelson, and for that reason Nelson is simply not helpful here.
*710 ś 73 Finally, at its heart, this case is about what remedy is appropriate for a violation of former RCW 42.17.760. In my view, the enforcement mechanisms provided in chapter 42.17 RCW[119] provide the appropriate remedies for violation of that chapter's provisions, as we have previously recognized in Crisman v. Pierce County Fire Protection Dist. No. 21, 115 Wash.App. 16, 60 P.3d 652 (2002).[120]
ś 74 In Crisman, the appellant argued that chapter 42.17 RCW's enforcement mechanisms compensated only the public for chapter violations, and that private tort claims for such violations would enhance enforcement of chapter prohibitions and provide compensation for individual victims. We rejected appellant's argument that private claims were available, noting that chapter 42.17 RCW "authorizes enforcement by the attorney general or county prosecutor and finally by a citizen in the name of the state. RCW 42.17.400." Crisman, 115 Wash.App. at 23, 60 P.3d 652. We further held:
Chapter 42.17 RCW sets out various enforcement procedures and provides for both legal and equitable remedies. But the various remedies RCW 42.17.390 authorize suggest that the legislature intended not to create private causes of action to enforce the code, but to give the attorney general, county prosecutor, or citizen enforcer considerable latitude in seeking the appropriate relief. We conclude that chapter 42.17 RCW does not imply a private cause of action.
Crisman, 115 Wash.App. at 24, 60 P.3d 652; see also Vance v. Thurston County Comm'rs, 117 Wash.App. 660, 670, 71 P.3d 680 (2003), review denied, 151 Wash.2d 1013, 88 P.3d 965 (2004) ("RCW 42.17.400 provides the remedy for violations of chapter 42.17 RCW and specifies that the attorney general or the local prosecuting attorney may bring an action to enforce this chapter.").[121] Consistent with Crisman, I would hold that none of the Davenport plaintiffs' claims asserted in their amended complaint is available.
ś 75 In sum, this court's sua sponte provision of a new cause of action for restitution is neither warranted nor appropriate. The newly imposed cause of action for restitution is the only basis found by the majority for affirming the trial court's denial of WEA's motion for judgment on the pleadings. Because I do not believe restitution is available, I would reverse the trial court's denial of WEA's CR 12(c) motion and remand for dismissal.[122]
NOTES
[1] Judge J. Dean Morgan is serving under CAR 21(c), having retired from this court in 2005.
[2] Laws of 1993, ch. 2 § 16. Effective May 11, 2007, the Washington legislature amended the former statute by re-designating it as subsection (1) and adding subsection (2). Laws of 2007, ch. 438. Because the trial court entered the judgment we are reviewing on January 18, 2002, more than five years earlier, nothing herein deals with the 2007 amendment.
[3] Chapter 41.59 RCW; RCW 41.59.900 (short title).
[4] RCW 41.59.020(4).
[5] RCW 41.59.070(3).
[6] RCW 41.59.010, .020(1).
[7] RCW 41.59.020(5).
[8] See RCW 41.59.060(1) (employees have not only the rights to self-organize and bargain collectively through representatives of their own choosing, but also "the right to refrain from any or all of such activities except to the extent that employees may be required to pay a fee to any employee organization under an agency shop agreement authorized in this chapter").
[9] RCW 41.59.100 ("A collective bargaining agreement may include union security provisions including an agency shop, but not a union or closed shop.").
[10] Clerk's Papers (CP) at 70.
[11] CP at 337.
[12] See State ex rel. Wash. State Pub. Disclosure Comm'n v. Wash. Educ. Ass'n., 156 Wash.2d 543, 552, 130 P.3d 352 (2006) (PDC II), rev'd sub nom., Davenport v. Wash. Educ. Ass'n, 551 U.S. 177, 127 S.Ct. 2372, 168 L.Ed.2d 71 (2007).
[13] State ex rel. Wash. State Pub. Disclosure Comm'n v. Washington, 117 Wash.App. 625, 631, 71 P.3d 244 (2003) (PDC I), aff'd, PDC II, 156 Wash.2d at 552, 130 P.3d 352.
[14] CP at 60.
[15] CP at 174-75.
[16] The trial court dismissed the plaintiffs' claim for breach of fiduciary duty and denied class certification on the claim for fraudulent concealment. No one has sought review of either ruling.
[17] Judge Hunt dissented.
[18] PDC I, 117 Wash.App. 625, 71 P.3d 244; Davenport v. Wash. Educ. Ass'n, noted at 117 Wash. App. 1035 (2003), aff'd, PDC II, 156 Wash.2d at 552, 130 P.3d 352, rev'd, Davenport, 127 S.Ct. 2372.
[19] Justice Sanders dissented, and two other justices concurred in his dissent.
[20] PDC II, 156 Wash.2d 543, 130 P.3d 352.
[21] Davenport, 127 S.Ct. 2372.
[22] WEA's Suppl. Br. at 3.
[23] "The function of a summary judgment proceeding, or a judgment on the pleadings, is to determine whether or not a genuine issue of fact exists, not to determine issues of fact." Zempel v. Twitchell, 59 Wash.2d 419, 425, 367 P.2d 985 (1962). As a result, the Washington Supreme Court has "held on numerous occasions that findings of fact and conclusions of law are superfluous in both summary judgment and judgment on the pleadings proceedings." Wash. Optometric Ass'n v. Pierce County, 73 Wash.2d 445, 448, 438 P.2d 861 (1968). See also Zempel, 59 Wash.2d at 425, 367 P.2d 985 (holding that findings are unnecessary).
[24] CR 12(c); see also Postema v. Pollution Control Hearings Bd., 142 Wash.2d 68, 122, 11 P.3d 726 (2000); Bravo v. Dolsen Cos., 125 Wash.2d 745, 750, 888 P.2d 147 (1995). We need not address the United States Supreme Court's recent decision in Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (abrogating Conley v. Gibson, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). Although Twombly dismissed a complaint because the facts relied on were not plausible as well as conceivable, the facts relied on here are both plausible and conceivable. Moreover, Twombly was supervisory rather than constitutional, and the Washington Supreme Court has not yet adopted it. See McCurry v. Chevy Chase Bank, F.S.B., 144 Wash.App. 900, 904, 193 P.3d 155 (2008) (declining to apply Twombly standard because Washington court rule and Supreme Court precedent, not the United States Supreme Court's interpretation of a federal court rule, provides mandatory authority for this court).
[25] We express no opinion on whether the trial court, on remand after this appeal, might use judicial estoppel as a basis for concluding that WEA's stipulation of September 25, 2000, established real rather than hypothetical facts. For a recent discussion of judicial estoppel, see Miller v. Campbell, 164 Wash.2d 529, 192 P.3d 352, 357 (2008).
[26] Sunnyside Valley Irrigation Dist. v. Dickie, 149 Wash.2d 873, 880, 73 P.3d 369 (2003); Rettkowski v. Dep't of Ecology, 128 Wash.2d 508, 515, 910 P.2d 462 (1996).
[27] Sunnyside Valley Irrigation Dist., 149 Wash.2d at 880, 73 P.3d 369; Rettkowski, 128 Wash.2d at 515, 910 P.2d 462.
[28] Nelson v. McClatchy Newspapers, Inc., 131 Wash.2d 523, 532 n. 6, 936 P.2d 1123 (1997), cert. denied, 522 U.S. 866, 118 S.Ct. 175, 139 L.Ed.2d 117 (1997); Seeber v. Wash. State Pub. Disclosure Comm'n, 96 Wash.2d 135, 139, 634 P.2d 303 (1981); Wash. Dep't of Revenue v. Hoppe, 82 Wash.2d 549, 552, 512 P.2d 1094 (1973).
[29] See Marquis v. City of Spokane, 130 Wash.2d 97, 108-09, 922 P.2d 43 (1996); Parkridge Assocs., Ltd. v. Ledcor Indus., Inc., 113 Wash.App. 592, 607, 54 P.3d 225 (2002).
[30] W. Petroleum Imps., Inc. v. Friedt, 127 Wash.2d 420, 424, 899 P.2d 792 (1995).
[31] Amalgamated Transit Union Local 587 v. State, 142 Wash.2d 183, 205, 11 P.3d 762, 27 P.3d 608 (2001) ("[I]n determining the meaning of a statute enacted through the initiative process, the court's purpose is to ascertain the collective intent of the voters who, acting in their legislative capacity, enacted the measure.").
[32] Parents Involved in Cmty. Schs. v. Seattle Sch. Dist., No. 1, 149 Wash.2d 660, 671, 72 P.3d 151 (2003) (when attempting to discern voters' intent, court may consider the official voters' pamphlet); see also Bennett v. Hardy, 113 Wash.2d 912, 920-21, 784 P.2d 1258 (1990) (intent will be implied when (1) the plaintiff is within the class for whose benefit the statute was enacted; (2) legislative intent, explicitly or implicitly, supports such a remedy; and (3) implying a remedy is consistent with the underlying legislative purpose); Crisman v. Pierce County Fire Prot. Dist. No. 21, 115 Wash.App. 16, 22, 60 P.3d 652 (2002).
[33] Gonzaga Univ. v. Doe, 536 U.S. 273, 286, 122 S.Ct. 2268, 153 L.Ed.2d 309 (2002).
[34] Documents available as legislative history for Senate Bill 5864 and Substitute Senate Bill 5864, 52d Leg., Reg. Sess. (Wash.1991), include (1) the senate bill and substitute senate bill in original and amended forms, (2) the senate bill reports, and (3) the senate bill digests. See http://dlr.leg. wa.gov/tld/results.aspx?params=1991-92,5864 (last visited Nov. 14, 2008).
[35] State of Washington Voters Pamphlet, General Election at 8-23 (Nov. 3, 1992).
[36] The drafters of former RCW 42.17.760 could have done that simply by adding a second sentence to the statute, stating that if a labor organization violates former RCW 42.17.760 by using all or part of an agency shop fee for political purposes without affirmative authorization, the individual from whose salary the fee was deducted may sue to recover the fee (or that part of the fee that was spent improperly).
[37] RCW 42.17.400(1); see also RCW 42.17.400(4).
[38] RCW 42.17.400(4)(b).
[39] State v. Modica, 164 Wash.2d 83, 93, 186 P.3d 1062 (2008); Wash. Natural Gas Co. v. Pub. Util. Dist. No. 1, 77 Wash.2d 94, 98, 459 P.2d 633 (1969); State v. Roadhs, 71 Wash.2d 705, 707, 430 P.2d 586 (1967); Kitsap Co. v. Cent. Puget Sound Growth Mgmt. Hearings Bd., 138 Wash. App. 863, 878, 158 P.3d 638 (2007).
[40] Crisman, 115 Wash.App. at 23, 60 P.3d 652; see also Vance v. Offices of Thurston County Comm'rs., 117 Wash.App. 660, 71 P.3d 680 (2003) (following Crisman), review denied, 151 Wash.2d 1013, 88 P.3d 965 (2004).
[41] Crisman, 115 Wash.App. at 23, 60 P.3d 652.
[42] See, e.g., Puget Realty Co. v. King County, 50 Wash. 349, 97 P. 226 (1908) (appellant entitled to restitution after county assessor mistakenly assessed $13,000 in taxes against appellant's property); cf. Bosworth v. Wolfe, 146 Wash. 615, 623-24, 264 P. 413 (1928) (recognizing action for restitution, which the case terms an action "for money had and received").
[43] In Bennett, 113 Wash.2d 912, 784 P.2d 1258, the Washington Supreme Court recognized that civil relief for a violation of statute can come either from a newly created statutory cause of action or from an already-existing common law cause of action. The Bennett court quoted from the Restatement (Second) of Torts § 874A (1979) as follows:

When a legislative provision protects a class of persons by proscribing or requiring certain conduct but does not provide a civil remedy for the violation, the court may, if it determines that the remedy is appropriate in furtherance of the purpose of the legislation and needed to assure the effectiveness of the provision, accord to an injured member of the class a right of action, using a suitable existing tort action or a new cause of action analogous to an existing tort action.
Bennett, 113 Wash.2d at 920, 784 P.2d 1258 (emphasis added).
[44] Nelson, 131 Wash.2d at 534, 936 P.2d 1123.
[45] Section 8 is codified as RCW 42.17.680(2).
[46] The opinion's silence being dispositive, we need not resolve WEA's assertion that Nelson was actually alleging a public cause of action. See WEA's Reply Brief at 4, n. 4.
[47] Eggert v. Vincent, 44 Wash.App. 851, 855, 723 P.2d 527 (1986), review denied, 107 Wash.2d 1034 (1987).
[48] In re Marriage of Langham, 153 Wash.2d 553, 564, 106 P.3d 212 (2005) (quoting Meyers Way Dev. Ltd. P'ship v. Univ. Sav. Bank, 80 Wash.App. 655, 674-75, 910 P.2d 1308, review denied, 130 Wash.2d 1015, 928 P.2d 416 (1996)); W. Farm Serv., Inc. v. Olsen, 151 Wash.2d 645, 648 n. 1, 90 P.3d 1053 (2004) (citing Paris Am. Corp. v. McCausland, 52 Wash.App. 434, 443, 759 P.2d 1210 (1988)); Pub. Util. Dist. No. 1 v. Wash. Pub. Power Supply Sys., 104 Wash.2d 353, 378, 705 P.2d 1195 (1985); Judkins v. Sadler-MacNeil, 61 Wash.2d 1, 3, 376 P.2d 837 (1962); Consulting Overseas Mgmt., Ltd. v. Shtikel, 105 Wash.App. 80, 83, 18 P.3d 1144 (2001) (citing Wash. State Bank v. Medalia Healthcare L.L.C., 96 Wash.App. 547, 554, 984 P.2d 1041 (1999), review denied, 140 Wash.2d 1007, 999 P.2d 1261 (2000)), review denied, 145 Wash.2d 1003 (2001); Eggert, 44 Wash.App. at 854, 723 P.2d 527 (citing Olin v. Goehler, 39 Wash.App. 688, 693, 694 P.2d 1129, review denied, 103 Wash.2d 1036 (1985)); 16 David K. DeWolf & Keller W. Allen, Washington Practice: Tort Law and Practice § 13.33, at 410 (3d ed.2006).
[49] In re Langham, 153 Wash.2d at 565, 106 P.3d 212 (quoting Meyers Way Dev., 80 Wash.App. at 675, 910 P.2d 1308); In re Marriage of Bureta, 140 Wash.App. 119, 123, 164 P.3d 534 (2007) (quoting In re Langham, 153 Wash.2d at 565, 106 P.3d 212).
[50] Public Util. Dist. No. 1, 104 Wash.2d at 378, 705 P.2d 1195; Seekamp v. Small, 39 Wash.2d 578, 583, 237 P.2d 489 (1951) (quoting Davin v. Dowling, 146 Wash. 137, 140-41, 262 P. 123 (1927)); see also H.D. Warren, Annotation, Nature of Property or Rights Other Than Tangible Chattels Which May be Subject of Conversion, 44 A.L.R.2d 927 (1955); 16 DeWolf & Allen, supra, § 13.33, at 410.
[51] See Seekamp v. Small, 39 Wash.2d 578, 237 P.2d 489; Warren, supra, 44 A.L.R.2d 927 at § 7(c) (general rule is that "action for conversion will not lie for money represented by a general debt"); cf. Meyers Way Dev., 80 Wash.App. at 675, 910 P.2d 1308 (secured creditor's interest in proceeds from the sale of sand was type of "property interest" in money needed to support conversion).
[52] Seekamp, 39 Wash.2d 578, 237 P.2d 489.
[53] The court noted that "there can be no conversion of money unless it was wrongfully received by the party charged with conversion, or unless such party was under obligation to return the specific money to the party claiming it;" that "[t]he only reasonable inference from the evidence was that [the defendant] was not required to deliver specific money to [the plaintiff];" and thus that "an action in conversion was inappropriate in this case." Seekamp, 39 Wash.2d at 583, 237 P.2d 489.
[54] Seekamp, 39 Wash.2d at 584, 237 P.2d 489.
[55] Seekamp, 39 Wash.2d at 583-84, 237 P.2d 489; see also Cone v. Ariss, 13 Wash.2d 650, 654, 126 P.2d 591 (1942) (although trial court did not adopt plaintiff's conversion theory, plaintiff "was nevertheless entitled to recover what he had paid on the purchase price, as money had and received by appellant, under the principle that `no one ought unjustly to enrich himself at the expense of another'").
[56] See, e.g., Chandler v. Wash. Toll Bridge Auth., 17 Wash.2d 591, 600, 137 P.2d 97 (1943); Pierce County v. State, 144 Wash.App. 783, 828-30, 185 P.3d 594 (2008); Auburn Mech., Inc. v. Lydig Constr., Inc., 89 Wash.App. 893, 903-04, 951 P.2d 311 (quoting Bill v. Gattavara, 34 Wash.2d 645, 650, 209 P.2d 457 (1949)), review denied, 136 Wash.2d 1009 (1998); 66 Am.Jur.2d Restitution and Implied Contracts, § 2 (2001) ("Contracts implied in law are fictions of law adapted to enforce legal duties by actions of contract, where no proper contract exists, express or implied. A contract will be ... implied in law whenever necessary to account for a relation found to exist between the parties where no contract in fact exists. An agreement `implied in law' is a fiction of law...."). For a brief description of the evolution of these terms, see Restatement (First) of Restitution: Quasi Contracts and Constructive Trusts at 5-9 (introductory note) (1937) and 66 Am.Jur.2d, supra, § 169 (2001).
[57] See, e.g., Chandler, 17 Wash.2d at 600, 137 P.2d 97; Pierce County, 144 Wash.App. at 828, 185 P.3d 594; Auburn Mech., Inc., 89 Wash.App. at 905, 951 P.2d 311 (citing George E. Palmer, The Law of Restitution § 1.2, at 9 (1978)); Restatement, First, at 1 (general scope note) (law of restitution includes but is not limited to common law actions for quasi-contract).
[58] Bosworth v. Wolfe, 146 Wash. 615, 624, 264 P. 413 (1928); Seekamp, 39 Wash.2d at 583-84, 237 P.2d 489; Karpierz v. Easley, 68 S.W.3d 565, 570 (Mo.App.2002) ("suit for money had and received is an action at law founded upon an implied contract created by law," the principal function of which "is to prevent unjust enrichment").
[59] Nelson v. Appleway Chevrolet, Inc., 160 Wash.2d 173, 188, 157 P.3d 847 (2007) (rather than being a simple contract remedy, the law of restitution is "`itself a source of obligations, analogous in this respect to tort or contract'") (quoting Restatement (Third) of Restitution and Unjust Enrichment § 1 cmt. h at 12-13 (Discussion Draft 2000)); Chandler, 17 Wash.2d at 602, 137 P.2d 97 ("[T]he essence of quasi contractual obligation [is] that the retention of the benefit received by the defendant would be unjust."); Pierce County, 144 Wash.App. at 829, 185 P.3d 594 ("[C]ontract implied in law is based on the principle that no one should be unjustly enriched at the expense of another."); Restatement (Third) § 1 cmt. h at 13 (Discussion Draft) ("The identification of unjust enrichment as an independent basis of substantive liability in common-law legal systems was the central achievement of the first Restatement of Restitution."); Hanoch Dagan, The Law and Ethics of Restitution at 11 (2004).
[60] Restatement (Third) § 1 cmt. h at 12-13 (Discussion Draft). As two commentators visualize it, "the common law coach" runs on four, not three, "substantive wheels" â torts, contracts, property, and unjust enrichment. Dagan, supra, at 3 (quoting Richard A. Epstein, The Ubiquity of the Benefit Principle, 67 S. Cal. L.Rev. 1369, 1370-71 (1994)).
[61] Restatement (First) at 523.
[62] Restatement (First) at 523 (in contrast to a tort action, which "is based primarily on [the defendant's] wrongdoing," the only wrongdoing in a quasi-contractual action is "incidental to [the defendant's] unjust enrichment"); cf. Lynch v. Deaconess Med. Ctr., 113 Wash.2d 162, 165, 776 P.2d 681 (1989) ("Quasi contracts are founded on the equitable principle of unjust enrichment which simply states that one should not be `unjustly enriched at the expense of another.'") (quoting Milone & Tucci, Inc. v. Bona Fide Builders, Inc., 49 Wash.2d 363, 301 P.2d 759 (1956)); Trane Co. v. Randolph Plumbing & Heating, 44 Wash.App. 438, 442, 722 P.2d 1325 (1986) (elements of a quasi contract are (1) the enrichment of the defendant must be unjust and (2) the plaintiff cannot be a mere volunteer); Dagan, supra, at 11-12.
[63] Nelson, 160 Wash.2d 173, 157 P.3d 847.
[64] Nelson, 160 Wash.2d at 178, 157 P.3d 847.
[65] Nelson, 160 Wash.2d at 178-79 n. 3, 157 P.3d 847.
[66] Nelson, 160 Wash.2d at 188, 157 P.3d 847.
[67] Nelson, 160 Wash.2d at 187-88, 157 P.3d 847 (footnote omitted) (quoting Restatement (Third) § 1 cmt. b at 3) (Discussion Draft).
[68] Restatement (First) § 1 at 12.
[69] Chandler, 17 Wash.2d at 601, 137 P.2d 97; Dragt v. Dragt/DeTray, LLC, 139 Wash.App. 560, 576, 161 P.3d 473 (2007), review denied, 163 Wash.2d 1042, 187 P.3d 269 (2008) ("[E]nrichment alone will not trigger the doctrine; the enrichment must be unjust under the circumstances and as between the two parties."); Farwest Steel Corp. v. Mainline Metal Works, Inc., 48 Wash.App. 719, 732, 741 P.2d 58 ("[E]nrichment alone will not suffice ... [i]t is critical that the enrichment be unjust both under the circumstances and as between the two parties to the transaction.") (citing McGrath v. Hilding, 41 N.Y.2d 625, 394 N.Y.S.2d 603, 363 N.E.2d 328, 331 (1977)), review denied, 109 Wash.2d 1009 (1987); Restatement (First) § 1 at 13.
[70] Nelson, 160 Wash.2d at 188, 157 P.3d 847 (quoting Restatement (Third)) § 1 cmt. b at 3) (Discussion Draft). This formulation encompasses such a "wide variety," Restatement (First) at 1, of situations that it may be equivalent to stating that one person enriches another unjustly when the facts and circumstances of the particular case so indicate. See Dragt, 139 Wash.App. at 576, 161 P.3d 473 ("[E]nrichment must be unjust under the circumstances."); Farwest Steel Corp., 48 Wash.App. at 732, 741 P.2d 58 ("[E]nrichment [must] be unjust both under the circumstances and as between the two parties to the transaction."); 66 Am.Jur.2d, supra, § 2 (when ruling on implied-in-law contract, court should "consider[] all of the factors in light of the surrounding circumstances").
[71] Restatement (Third) of Restitution and Unjust Enrichment ch. 2 introductory note at 3) (Tentative Draft No. 1, 2001).
[72] Restatement (Third) topic 3 introductory note at 281 (Tentative Draft No. 1); Restatement (Third) topic 3 introductory note at 280-81 (Discussion Draft).
[73] Restatement (Third) topic 3 introductory note at 281 (Tentative Draft No. 1); Restatement (Third) topic 3 introductory note at 288 (Discussion Draft).
[74] See, e.g., Puget Realty, 50 Wash. 349, 97 P. 226 (appellant entitled to restitution after county assessor mistakenly assessed $13,000 in taxes against appellant's property).
[75] Broward County v. Mattel, 397 So.2d 457 (Fla. App.1981).
[76] Rosen v. Vill. of Downers Grove, 19 Ill.2d 448, 167 N.E.2d 230 (1960).
[77] Investors Title Co. v. Hammonds, 217 S.W.3d 288 (Mo.2007).
[78] In re Increase in Fees by the N.J. Bd. of Dentistry, 84 N.J. 582, 423 A.2d 640 (1980).
[79] Five Boro Elec. Contractors Ass'n v. City of New York, 12 N.Y.2d 146, 237 N.Y.S.2d 315, 187 N.E.2d 774 (1962).
[80] Broward County, 397 So.2d 457.
[81] Broward County, 397 So.2d at 460.
[82] Rosen, 167 N.E.2d 230.
[83] Rosen, 167 N.E.2d at 235.
[84] Investors Title Co., 217 S.W.3d 288.
[85] Investors Title Co., 217 S.W.3d at 297.
[86] In re N.J. Bd. of Dentistry, 423 A.2d 640.
[87] In re N.J. Bd. of Dentistry, 423 A.2d at 641.
[88] In re N.J. Bd. of Dentistry, 423 A.2d at 642.
[89] Five Boro Elec. Contractors Ass'n, 12 N.Y.2d 146, 237 N.Y.S.2d 315, 187 N.E.2d 774.
[90] Five Boro Elec. Contractors Ass'n, 237 N.Y.S.2d 315, 187 N.E.2d at 774.
[91] Five Boro Elec. Contractors Ass'n, 237 N.Y.S.2d 315, 187 N.E.2d at 775.
[92] Karpierz v. Easley, 68 S.W.3d 565 (Mo.App. W.D.2002).
[93] Wareham Educ. Ass'n v. Labor Relations Comm'n, 430 Mass. 81, 713 N.E.2d 363 (1999).
[94] RAP 12.8; Ehsani v. McCullough Family P'ship, 160 Wash.2d 586, 590, 159 P.3d 407 (2007); State v. A.N.W. Seed Corp., 116 Wash.2d 39, 44, 802 P.2d 1353 (1991); see also RAP 7.2(c), (e), (h).
[95] Restatement (First) § 74 at 302-03, provides that "[a] person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside, unless restitution would be inequitable or the parties contract that payment is to be final; if the judgment is modified, there is a right to restitution of the excess." Restatement (Third) § 18 at 281-82 (Tentative Draft No. 1), provides that "[a] transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution to the extent necessary to avoid unjust enrichment." (Embolding deleted.)
[96] Karpierz, 68 S.W.3d 565.
[97] Karpierz, 68 S.W.3d at 571 (emphasis added).
[98] Wareham Educ. Ass'n, 713 N.E.2d 363.
[99] Chicago Teachers Union, Local No. 1 v. Hudson, 475 U.S. 292, 106 S.Ct. 1066, 89 L.Ed.2d 232 (1986).
[100] Wareham Educ. Ass'n, 713 N.E.2d at 368. Although essentially the same situation is described in Elvin v. Oregon Public Employees Union, 313 Or. 165, 832 P.2d 36 (1992), we omit that case from the text. A teachers' union spent a portion of its agency shop fees for political purposes without giving its affected nonmembers an opportunity to opt out under Hudson. Nonmember teachers complained to the State Employee Relations Board, which found an unfair labor practice and ordered restitution of the portion spent for political purposes. The Oregon Supreme Court affirmed, stating that ORS 243.676(2)(c) gave the Board authority to order "such affirmative action ... as necessary," including "the authority to order restitution as a remedy for an unfair labor practice." Elvin, 832 P.2d at 43. Accordingly, we cannot tell whether the Elvin court was finding the legislative intent needed to imply a statutory cause of action, or whether it was relying on its own authority to develop and declare the common law of restitution. Assuming the latter, Elvin is on point here to the same extent as Wareham.
[101] We note in passing, though we need not consider it here, that at least one court has extended the effect of a condition's failure to a situation in which the initial transfer was voluntary rather than compelled by law. In Central Baptist Theological Seminary v. Entertainment Communications, Inc., 356 N.W.2d 785 (Minn. App. 1984), the Seminary and Entercom each operated a radio station. In 1963, Central conveyed land to Entercom in exchange for $26,000 plus Entercom's promise to build a radio transmission tower, in the use of which the Seminary would share for the next 99 years without additional cost. Although Entercom initially constructed the tower as agreed, after only 17 years the tower was destroyed in a 1980 windstorm. Entercom was not contractually obligated to rebuild the tower, and it opted not to do so, causing the Seminary to lose the use of the tower for 82 years of the 99-year lease. The Seminary sued for restitution, and the trial court granted summary judgment to Entercom. The Minnesota Court of Appeals reversed and remanded for trial, apparently reasoning that even though the initial transfer was voluntary rather than compelled by law, it was deprived of its initial justification when a material condition subsequent (the Seminary's use of the tower for 99 years) failed.
[102] We have no quarrel with most of the dissent. As Section I-B makes clear, we agree that WEA has been "the sole owner and possessor of the money" since receiving it, subject to any interest that RCW 42.17.760 vests in the plaintiffs. Concomitantly, we agree that RCW 42.17.760 does not vest the plaintiffs with a post-transfer property interest in the money, or, if it does, that the interest is so limited that it is best described as contingent or inchoate, but not possessory. We agree that the United States Supreme Court's comment about "other people's property" was nonbinding dictum. None of these propositions is material here, because a claim for common law restitution, unlike a claim for common law conversion, does not require that the plaintiffs have a property interest in the money at the time of trial. We materially disagree with the dissent only on whether WEA will be unjustly enriched if permitted to retain the money that plaintiffs are seeking to recover. In our view, WEA was unjustly enriched despite its willingness to rebate money to the plaintiffs at their request. For purposes of unjust enrichment, the issue is not whether the plaintiffs requested their money back, but whether they affirmatively consented to WEA's expenditure of it for political purposes.
[103] Hawkinson v. Conniff, 53 Wash.2d 454, 459, 334 P.2d 540 (1959). The other case cited by WEA is Order of U.S. District Court, Riensche v. Cingular Wireless LLC, No. C06-1325Z, 2007 WL 3407137 (W.D.Wash., Nov.9, 2007). Neither case is on point here, because neither involved a transfer compelled by law.
[104] WEA's Suppl. Br. at 9.
[105] Hawkinson, 53 Wash.2d at 458, 334 P.2d 540 (citing Speckert v. Bunker Hill Ariz. Mining Co., 6 Wash.2d 39, 106 P.2d 602 (1940)).
[106] In making this statement we are assuming â but not holding â that the doctrine is sometimes applicable in this type of case. Our assumption may be incorrect, however, because the problem with a transfer compelled by law is arguably unlike the problem with other types of transfers. According to the Restatement (Third), the problem with a transfer compelled by law generally "is not the lack of effective consent on the part of the transferor, but the fact that the transfer sought to be avoided (usually a payment) does not correspond to a proper legal liability." Restatement (Third) ch. 2 introductory note at 3-4 (Tentative Draft No. 1); see also Cent. Baptist Theological Seminary v. Entm't Commc'ns, Inc., 356 N.W.2d 785 (Minn.App. 1984), described in note 105, supra. The Reporter for the Restatement (Third) has even gone so far as to characterize the voluntary payment doctrine as "fallacious" when used to defeat recovery of an illegally collected tax. Restatement (Third) § 19, reporter's note f at 327 (Tentative Draft No. 1); see also reporter's note h, at 330 ("The more candid modern decisions acknowledge that describing a payment of an illegal tax as `voluntary' merely designates a payment that is irrecoverable; in other words, that the determination of `voluntariness' is a function, not of the payor's state of mind, but of policy considerations."). These statements suggest that compulsion and voluntariness are antitheses, so that to find that a transfer was compelled (by law or otherwise) is generally also to find that it was not made voluntarily. Perhaps for that reason, the authorities, including some of those discussed above, seem inclined to find that a transfer compelled by law is "involuntary" rather than "voluntary." See RAP 12.8; Broward County v. Mattel, 397 So.2d 457; Five Boro Elec. Contractors Ass'n, 187 N.E.2d 774; Rosen, 167 N.E.2d 230.
[107] Resp't Br. at 31 (citing RCW 42.17.410).
[108] RCW 42.17.410 states that "[e]xcept as provided in RCW 42.17.400(4)(a)(iv), any action brought under the provisions of this chapter must be commenced within five years after the date when the violation occurred." The exception is not pertinent here because this case does not involve a public or "citizen's" statutory action for a judgment that will escheat to the state under RCW 42.17.400. Rather, this case involves a private common law action for a judgment that will benefit the individual plaintiffs.
[109] WEA's Supp. Br. at 16 (citing Eckert v. Skagit Corp., 20 Wash.App. 849, 850, 583 P.2d 1239 (1978)).
[110] RCW 4.16.080(3); Seattle Prof'l Eng'g Employees Ass'n v. Boeing Co., 139 Wash.2d 824, 837-38, 991 P.2d 1126 (2000). Insofar as pertinent here, RCW 4.16.080(3) requires that an action be commenced within three years if it is "an action upon a contract or liability, express or implied, which is not in writing, and does not arise out of any written instrument."
[111] In other words, on remand the trial court shall certify "a class of all public school employees who, between March 19, 1998 and August 31, 2001 (inclusive), were nonmembers paying agency shop fees to defendant WEA." See CP at 174-75.
[112] Lacey Nursing Ctr., Inc. v. Dep't of Revenue, 128 Wash.2d 40, 47, 905 P.2d 338 (1995).
[113] This superior court rule provides that a trial court's discretionary leave to amend the pleadings "shall be freely given when justice so requires." CR 15(a).
[114] The majority so holds relying on foreign cases, and by analogizing to RAP 12.8, which provides for return of property or money paid pursuant to a judgment that is later reversed or modified on appeal.
[115] Notably, that interest has been substantially eroded by a recent amendment to the statute. Effective May 2007, a second section was added to RCW 42.17.760, which reads: "[a] labor organization does not use agency shop fees when it uses its general treasury funds to make such contributions or expenditures if it has sufficient revenues from sources other than agency shop fees in its general treasury to fund such contributions or expenditures." See RCW 42.17.760(2) (Laws of 2007, ch. 438, § 1). The amendment redefines the triggering event for the union's duty to seek affirmative authorization and limits the payer's limited veto power to those instances where the union cannot show sufficient other funds to cover the campaign contribution.
[116] Notably, the plaintiffs point to no instance of the union's failure to provide fee rebates under the Hudson procedures. Further, while the plaintiffs contended that the Hudson procedures did not adequately protect their rights, the Washington Supreme Court rejected that notion holding that "[t]he union's Hudson procedures protect dissenter's rights." State ex rel. Pub. Disclosure Comm'n, 156 Wash.2d at 569, 130 P.3d 352.
[117] In calling for supplemental briefing, we also asked the parties to address whether Nelson applied to this case.
[118] The Nelson court held that the dealership's practice of adding on the business's B & O tax to car sales after the parties had negotiated a final sale price was "explicitly forbidden by [RCW 82.04.500]." Nelson, 160 Wash.2d at 181, 157 P.3d 847.
[119] See RCW 42.17.390 (designating civil remedies and sanctions); see also RCW 42.17.400 (providing for enforcement by the attorney general, local prosecutor, or by a citizen's action in the name of the state).
[120] The trial court did not have the benefit of our decision in Crisman, which was published after the order now under review.
[121] Moreover, under RCW 42.17.400, the plaintiffs can bring an action (a citizen's action in the name of the state) only if the attorney general or the prosecuting attorney fails to act after receiving notice of possible violations. See State ex rel. Evergreen Freedom Found. v. Nat'l Educ. Ass'n., 119 Wash.App. 445, 452-53, 81 P.3d 911 (2003); Vance, 117 Wash.App. at 670, 71 P.3d 680; Crisman, 115 Wash.App. at 22, 60 P.3d 652.
[122] Because I would dismiss, it is not necessary to address the statute of limitations or class certification issues.